UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
==================================== :
JUSTIN LANASA, TSR, LLC, and                      :
DUNGEON HOBBY SHOP MUSEUM, LLC,       :      Case No. 22-cv-5686-KAM-VMS
                                                                            :
                    Plaintiffs,                                       :
                                                                            :
            — *versus* —                                        :
                                                                            :
ERIK STIENE, RACHEL STIENE,                          :
                                                                            :
            Jointly and Severally,                            :
                                                                            :
                    Defendants.                                   :
==================================== :


PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' RULE 12(b) MOTION TO DISMISS

Law Office of Bernard V. Kleinman, PLLC
108 Village Square
Suite 313
Somers, NY 10589-2305
Tel. 914.644.6660
Fax 914.694.1647
Email: attrnylwyr@yahoo.com
*Attorney for Plaintiffs*

January 30, 2024

# TABLE OF CONTENTS

Table of Authorities ......................................................................................... i

I. Introduction ................................................................................................ 1

II. Standards for Dismissal

    A. Dismissal Under Rule 12(b)(1) .............................................................. 3

    B. Dismissal Under Rule 12(b)(6) .............................................................. 4

III. The Second Amended Complaint Complies With the Court's Order ................... 5

IV. Rachel Stiene is a Properly Named Defendant (Defendants' Argument II, pp. 8-9) ...... 7

V. Dismissal Under Rule 12(b)(1) is Not Warranted —
    Section 1332 Provides No Basis for Dismissal (Defendants' Argument I, pp. 6-8) ...... 8

VI. This Action is Not Subject to anti-SLAPP Statute
    (Defendants' Argument III, pp. 9-13) ....................................................... 12

VII. Even Assuming the anti-SLAPP Statute is to be Applied, the
    Plaintiffs Have Established "Actual Malice" on Defendants' Part
    (Defendants' Argument IV, pp. 13-18) ...................................................... 15

VIII. The Asserted Examples of Defamation and Libel are Actionable
    Under the Law (Defendants' Arguments V & VI, pp. 18-23, 23-26) .................. 21

IX. Plaintiffs Have Set Forth a Valid Claim for Intentional Infliction of
    Emotional Distress (Defendants' Argument VII, pp. 26-27) ......................... 26

X. Plaintiffs' Cause of Action for Prima Facie Tort
    (Defendants' Argument VIII, pp. 28-29) .................................................. 29

XI. Conclusion ................................................................................................ 30

**TABLE OF AUTHORITIES**

**CASES**

*Adams v. Netflix, Inc.*, 726 Fed App'x 76 (2d Cir. 2018),
    *cert. denied* — U.S. — (2019) ...................................................................10

*Albert v. Loksen*, 239 F.3d 256 (2d Cir. 2001) ........................................................15

*Allen v. Meyers*, 2011 WL 721648 (S.D.N.Y. 2011) ................................................29

*Amuze v. Better Business Bureau*, 2023 NYLJ LEXIS 651 (S. Ct. N.Y. Co. 2023) ...............14

*Aoki v. Benihana, Inc.*, 839 F. Supp.2d 759 (D. Del. 2012) ....................................... 2

*Aristocrat Plastic Surgery, P.C. v. Silva*, 206 A.D.3d 26,
    169 N.Y.S.3d 272 (1st Dep't 2022) ...........................................................12

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ..................................................................... 4

*Bacon v. Nygard*, 2019 N.Y. Misc. LEXIS 3987 (S. Ct. N.Y. Co. 2019),
    *aff'd* 189 A.D.3d 530 (1st Dep't 2020) ......................................................26

*Bailey v. New York Law School*, 2021 WL 5500078 (2d Cir. 2021),
    *cert. denied* — U.S. — (2022) ...................................................................26

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................... 4

*Benning v. Corp. of Marlboro College*, 2014 U.S. Dist. LEXIS 107013 (D. Vt. 2014) ........ 9

*Bhuiyan v. Chinta*, 2023 N.Y. Misc. LEXIS 12928 (S. Ct. Qns. Co. 2023) ..................14

*Biro v. Conde Nast*, 963 F. Supp.2d 255 (S.D.N.Y. 2013),
    *aff'd* 807 F.3d 541 (2d Cir. 2015), *cert. denied* 578 U.S. 976 (2016) ........16

*Bolt Elec. Inc. v. City of New York*, 53 F.3d 465 (2d Cir. 1995) ............................... 4

*Bourne v. Town of Madison*, 2006 U.S. Dist. LEXIS 88403 (D.N.H. 2006) ................18

*Brian v. Richardson*, 87 N.Y.2d 46, 637 N.Y.S.2d 47 (1995) ..................................22

*Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314 (1983) ................ 9

*CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280 (4th Cir. 2008) ..........................20

*Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41 (2d Cir. 2003) ............................. 4

*Carter v. HealthPort Technologies, LLC*, 822 F.3d 47 (2d Cir. 2016) ..................... 3, 4

*Carroll v. Trump*, 22-cv-10016 (S.D.N.Y.) ........................................................11-12

*Chase Manhattan Bank, N.A. v. American Nat'l Bank & Trust Co.*
    *of Chicago*, 93 F.3d 1064 (2d Cir. 1996) .................................................... 9

*Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001) ..........................16

*Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214 (2d Cir. 2006) ................ 9

*Coleman v. Grand*, 523 F. Supp.3d 244 (E.D.N.Y. 2021) .......................................15

*Curiano v. Suozzi*, 63 N.Y.2d 113 (1984) ..............................................................29

[ii]

*Curtis Publishing Co. v. Butts*, 388 U.S. 130, *reh'g denied* 389 U.S. 889 (1967) ............20

*Daniels v. Provident Life & Casualty Ins. Co.*, 2002 WL 31887800
    (W.D.N.Y. 2002) ............25

*Davis v. Boeheim,* 24 N.Y.3d 262, 998 N.Y.S.2d 131 (2014) ............22

*Delaware Valley Aesthetics, PLLC v. Doe 1,*
    2022 WL 17094740 (E.D. Pa. Nov. 21, 2022) ............17

*Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1 (1st Dep't 1999) ............22

*Divet v. Reinisch*, 169 A.D.2d 416, 564 N.Y.S.2d 142 (1st Dep't 1991) ............24

*Dongguk University v. Yale University*, 734 F.3d 113 (2d Cir. 2013) ............14, 16

*Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) ............13

*Edelman v. United States,* 2020 U.S. Dist. LEXIS 228334 (E.D.N.Y 2020) ............26

*Elliott v. Donegan,* 469 F. Supp.3d 40 (E.D.N.Y. 2020) ............20

*Feitosa v. Keem*, 2023 WL 2267055 (W.D.N.Y. Feb. 28, 2023) ............10

*Flamm v. Am. Ass'n of University Women*, 201 F.3d 144 (2d Cir. 2000) ............22

*Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205 (2d Cir. 2004) ............ 4

*Freihofer v. Hearst Corp.*, 65 N.Y.2d 135 (1985) ............29

*G.W. v. C.N.*, 78 Misc.3d 289 (S. Ct. Monroe Co. 2022) ............28

*Gasery v. Kalakuta Sunrise, LLC*, 422 F. Supp.3d 807 (S.D.N.Y. 2019) ............ 9

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ............20

*Ghashiyah v. Frank*, 2008 U.S. Dist. LEXIS 18378 (E.D. Wisc. 2008) ............ 7

*Gillispie v. King*, 217 A.D.3d 566, 192 N.Y.S.3d 78 (1st Dep't 2023) ............14

*Gottwald v. Sebert*, 40 N.Y.3d 240, 197 N.Y.S.3d 694 (2023) ............19

*Greer v. Carlson*, 2020 U.S. Dist. LEXIS 190499 (S.D.N.Y 2020) ............26

*Grimaldi v. Schillaci*, 106 A.D.2d 728, 484 N.Y.S.2d 159 (3d Dep't 1984) ............23

*Herlihy v. Metropolitan Museum of Art*, 214 A.D.2d 250 (1st Dep't 1995) ............26

*Howell v. New York Post Co.*, 81 N.Y.2d 115 (1993) ............27

*Huggins v. Moore*, 94 N.Y.2d 296, 704 N.Y.S.2d 904 (1999) ............14

*Hryhorijiv (Grigorieff) v. Winchell*, 180 Misc. 574, 45 N.Y. Supp. 31
    (S. Ct. N.Y. Co. 1943), *aff'd* 267 App. Div. 817 (1st Dep't 1944) ............25

*Immuno AG v. Moor-Jankowksi,* 77 N.Y.2d 235, 566 N.Y.S.2d 906 (1991) ............23

*J.B. v. K.S.G.*, 2023 WL 2851170 (S. Ct. Cortland Co. 2023) ............28

*Jankovic v. Int'l Crisis Group*, 822 F.3d 576 (D.C. Cir. 2016) ............21

*Iantosca v. Elie Tahari, Ltd.*, 2020 U.S. Dist. LEXIS 171512 (S.D.N.Y 2020 ............18

*Johnson v. Staten Isl. Advance Newspaper, Inc.*, 2004 N.Y. Slip Op.
51904(U) (Civ. Ct. Richmond Co. Jul. 23, 2004) .................................21

*Kamen v. Am. Telephone & Telegraph Co.*, 791 F.2d 1006 (2d Cir. 1986) ......... 3

*Karl Reeves v. Associated Newspapers*, 2021 N.Y. Misc. LEXIS 11084
(S. Ct. N.Y. Co. 2021) ...............................................................25

*Kerns v. Ishida*, 2022 N.Y. Misc. LEXIS (S. Ct. N.Y. Co. 2023) ...............14

*Kessner v. Jones*, 2023 U.S. App. LEXIS 15255 (2d Cir. 2023) ................12

*Kruglov v. Copart of Connecticut, Inc.*, 771 Fed. App'x 117 (2d Cir. 2019) ...........10

*Lerman v. Flynt Distributing Co.*, 745 F.2d 123 (2d Cir. 1984) ...............20

*Madarassy v. Saratogian Div. of Gannett Satellite Information Network, Inc.*,
1995 WL 263511 (S. Ct. Saratoga Co. Jan. 24, 1995) ...........................21

*Majarova v. United States*, 201 F.3d 110 (2d Cir. 2000) ...................... 3

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ...................16

*Matsuba v. Hernandez*, 2023 N.Y. Misc. LEXIS 763 (S. Ct. N.Y. Co. 2023) ...........29

*McDougal v. Fox News Network, LLC*, 489 F. Supp.3d 174 (S.D.N.Y. 2020) ...........16

*McHerron v. Burnt Hills-Ballston Lake Central School Dist.*,
778 Fed. App'x 54 (2d Cir. 2019) ..............................................13

*McNamee v. Clemens*, 762 F. Supp.2d 584 (E.D.N.Y. 2011) ......................24

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ..........................23

*Naantaanbuu v. Abernathy*, 816 F. Supp. 218 (S.D.N.Y. 1993) .................20

*Novak v. Rubin*, 129 A.D.2d 780 (2d Dep't 1987) .............................30

*Oliver v. Precythe*, 2023 U.S. Dist. LEXIS 126800 (E.D. Mo. 2023) ........... 7

*Pena v. British Airways, PLC (UK)*, 849 Fed. App'x 13 (2d Cir. 2021) .........10

*Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 494 F. Supp. 505
(S.D.N.Y. 1980), *mdf'd on other grnds.* 646 F.2d 800 (2d Cir. 1981) ...........16

*Reserve Solutions, Inc. v. Vernaglia*, 438 F. Supp.2d 280 (S.D.N.Y. 2006) .........25

*Reus v. ETC Housing Corp.*, 72 Misc.3d 479, 148 N.Y.S.3d 663
(S. Ct. Clinton Co. 2021), *aff'd* 203 A.D.3d 281 (3d Dep't 2022) .............15

*Reynolds v. Pegler*, 223 F.2d 429 (2d Cir. 1955), *cert. denied* 350 U.S. 846 (1956) ...........17

*Rich v. Fox News Network*, 939 F.3d 112 (2d Cir. 2019) .......................27

*R.M. v. C.M.*, 79 Misc.3d 250 (S. Ct. Orange Co. 2023) ......................28

*Roth v. Jennings,* 489 F.3d 499 (2d Cir. 2007) ............................... 4

*Sandals Resorts Int'l Ltd. v. Google, Inc.,* 86 A.D.3d 32,
925 N.Y.S.2d 407 (1st Dep't 2011) ...........................................23

*Sanders v. Sanders*, 2022 WL 16984681 (2d Cir. 2022) ...................................................19

*Scherer v. Equitable Life Assurance Soc'y of the United States*,
    347 F.3d 394 (2d Cir. 2003) .......................................................................... 8, 9

*Schwartz v. American College of Emergency Physicians*, 215 F.3d 1140 (10th Cir. 2000) ...21

*Shcolnik v. Rapid Settlements, Ltd.*, 670 F.3d 624 (5th Cir. 2012) ....................................18

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...........................................................................14

*Sokol v. Leader*, 74 A.D.3d 1180, 1181-82 (2d Dep't 2010) ............................................24

*Soobzokov v. Lichtblau*, 2016 WL 614411 (D.N.J. Feb 16, 2016) ....................................18

*Spickler v. K.B.*, 2024 N.Y. Misc. LEXIS 233 (S. Ct. Albany Co. 2024) ........................28

*St. Paul Indemnity Co. v. Red Cab Co.*, 303 U.S. 283 (1938) .......................................... 8

*Steinhilber v. Alphonse*, 68 N.Y.2d 283, 508 N.Y.S.2d 901 (1986) ...............................23

*Stewart v. Jackson & Nash*, 976 F.2d 86 (2d Cir. 1992) ................................................. 5

*Stih v. Rockaway Famers Market, Inc.*, 2023 WL 2760492 (E.D.N.Y. Apr. 3, 2023) .........25

*Suarez v. Mosaic Sales Solutions US Operating Co., LLC*,
    720 Fed. App'x 52 (2d Cir. 2018) ..................................................................10

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
    752 F.3d 239 (2d Cir. 2014) ........................................................................... 3

*Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781 (2d Cir. 1994) ...................... 8

*TSR, LLC v. Wizards of the Coast*, 21-cv-1705 (W.D. Wash.) .........................................19

*United Food & Comm'l Workers Union Local 919, AFL-CIO v.*
    *Centermark Properties Meridien Square, Inc.*, 30 F.3d 298 (2d Cir. 1994) ............. 9

*United States v. Tatum*, 2023 U.S. Dist. LEXIS 75482 (W.D.N.C. 2023) .........................27

*Vangheluwe v. Got News, LLC*, 365 F. Supp.3d 850 (E.D. Mich. 2019) ..........................26

*Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ......................20

*White, In re*, 551 B.R. 814 (S.D. Ohio 2016) ..................................................................18

*White v. Tarbell*, 284 A.D.2d 888, 727 N.Y.S.2d 496 (3d Dep't 2001) ............................20

*Wojtczak v. Safeco Property & Casualty Insurance Cos.*,
    669 F. Supp.2d 305 (W.D.N.Y. 2009) ...........................................................11

*Wolde-Meskel v. Vocational Instruction Project Community Svces., Inc.*,
    166 F.3d 59 (2d Cir. 1999) .......................................................................... 8, 9

*Zervos v. Trump*, 59 Misc.3d 790, 74 N.Y.S.3d 442 (S. Ct. N.Y. Co. 2018),
    *aff'd* 171 A.D.3d 110 (1st Dep't 2019), *appeal dism'd* 36 N.Y.3d 1083 (2021) .......24

## STATUTES & RULES

28 U.S.C. § 1332(a) .................................................................... 8-12

Rule 4(m) .................................................................................. 8

Rule 11(b)(3) ............................................................................ 6

Rule 12(b) ................................................................................. 3-5

N.Y. CPLR Rule 3016 ............................................................... 24

N.Y. CPLR § 6341 .................................................................... 28

N.Y. Civil Rights L. §§ 50, 51 ................................................. 29

N.Y. Civil Rights L. § 74 ......................................................... 25

N.Y. Civil Rights L. § 76-a ...................................................... *passim*

N.Y.C. Charter § 460(h) ........................................................... 27

## OTHER SOURCES

Nat'l Library of Medicine Table 10, Diagnostic Criteria for OCD in
ICD 10 and DSM IV ........................................................... 1

Hsu, *As Deepfakes Proliferate, Nations Struggle to React*,
THE NEW YORK TIMES (Jan. 23, 2023) ................................ 27

Wang, M., *Comment: Don't Believe Your Eyes: Fighting Deepfaked
Nonconsensual Pornography with Tort Law*,
2022 U. CHI. LEGAL FORUM 415 (2022) ............................ 27

Plaintiffs, by and through their counsel of record, Bernard V. Kleinman, Esq., do submit this Memorandum of Law in Opposition to Defendants' Rule 12(b) Motion to Dismiss.

I. Introduction

It is important to understand precisely what this case is about. While the Plaintiffs have formulated their claim in the context of a Complaint alleging tortious conduct on the part of the Defendants that has caused the Plaintiffs both economic and personal harm, what this case really boils down to is the obsessive and compulsive behavior of the Defendants — both Erik Stiene and Rachel Stiene — targeting not only the named Plaintiffs Justin Lanasa, his business entities Dungeon Hobby Shop Museum LLC, and TSR, LL, but, without shame and with pure unadulterated malice, the Plaintiff Lanasa's wife and minor child. The psychologically obsessive and repetitive behavior of the Defendants in posting scores of videos targeting the named Plaintiffs, and then seeking to do harm to Mr. Lanasa's wife and minor child represent malice that goes well beyond the norm, and enters the realm of questionable mental disorder.

Yet the Defendants, like all parties who engage in defamatory conduct seek a "get out of jail free" card by raising, not only the bar of the New York anti-SLAPP statute, but also unrelated and un-necessarily specious and unfounded claims. Tortfeasors like the Defendants seek refuge in the statute and claims of free speech, as if these defenses will defeat any defamatory statement no matter how outrageous or infected with malice. However, this is just not the law.

As set forth in the Plaintiffs' complaint, the Defendants have repeatedly, and all but clinically obsessively,[1] targeted the Plaintiff, his companies and his family.

---

[1] According to the DSM IV, obsessive compulsive disorder is characterized by "Repetitive behaviors . . . or mental acts . . . that the person feels driven to perform in response to an obsession, . . ." DSM IV Table 3.13. See also Nat'l Library of Medicine Table 10, Diagnostic Criteria for OCD in ICD 10 and DSM IV.
See *https://www.ncbi.nlm.nih.gov/books/NBK56452/*.

Yet, as with many tortfeasors who rely upon publishing their defamatory and libelous statements on-line, there appears to be a belief that the rules do not apply to on-line action. It is as if the Defendants believe, as many such tortfeasors do, that with the availability of multiple means of making one's word hear, whether through Youtube®, Telegram®, Instagram®, Facebook®, X®, *etc.*, special rules apply here and the use of these methods to commit a tort immunizes them from liability. It does not. Indeed, the dangers and harm are even greater than the publishing of a defamatory statement in a newspaper or magazine. Use of Youtube® (as the Defendants have done here) allows for the "widespread dissemination of allegedly defamatory matter" (*Aoki v. Benihana, Inc.*, 839 F. Supp.2d 759, 765 (D. Del. 2012)) within a matter of seconds, exacerbating and inflating the potential for damages to the harmed plaintiff.

It is within this context that the actions of the Defendants need to be analyzed and ruled upon. Finally, while the Defendants seek comfort in the arms of the First Amendment, the Court should keep in mind that the offending language here was not political or of a public interest nature. It was targeted language (much of it puerile and obscene) at a specific individual and his companies and family solely designed to cause him harm — and repeated scores of times.

The number of Youtube® postings of the Defendants that defamed the Plaintiffs are all but too numerous to count. A small example was provided to the Defendants in the Rule 26(a)(1) initial disclosure, and is annexed hereto as <u>Exhibit A</u>. These postings will demonstrate to any factfinder that the actions of the Defendants were solely and exclusively motivated by an actionable malicious intent to harm the Plaintiffs. See also Second Amended Complaint ("SAC"), ECF No. 62, at ¶¶ 30, 31.

Yet, even since the filing of the Rule 26(a)(1) Disclosure, the Defendants have continued to make such postings (all of which will be discussed, in detail, at trial), clearly demonstrating the bizarre obsession of Mr. and Mrs. Stiene with the Plaintiffs, almost as if Justin Lanasa is Erik Stiene's *raison d'etre*, without whom he would have little reason to exist. See <u>Exhibit B</u>.

While the Defendants assert that none of the statements published by the Defendants are defamatory, as set forth below, each and every one of the published statements made by the Defendants and published on Youtube are and should be considered as defamatory under existing case law in New York, and satisfy the requirements of the New York Civil Pattern Jury Instructions.[2]

II. Standards for Dismissal

A. Dismissal Under Rule 12(b)(1)

Rule 12(b)(1) provides for dismissal of a claim when a court lacks subject matter jurisdiction. A federal court has subject matter jurisdiction over an action "where the amount in controversy exceeds $75,000, exclusive of interests and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a).

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial," *i.e.*, based solely on the allegations of the complaint and exhibits attached to it, "or fact-based," *i.e.*, based on evidence beyond the pleadings. *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56 (2d Cir. 2016). Hence a district court "may refer to evidence outside the pleadings" when resolving a 12(b)(1) motion. *Majarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). See also *Kamen v. Am. Telephone & Telegraph Co.*, 791 F.2d 1006 (2d Cir. 1986) ("when, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise." *Id*. at 1011.). It is only where "jurisdictional facts are placed in dispute" — such as in the case at Bar — that the court has the "obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). When the extrinsic evidence submitted by a party does not controvert the material

---

[2] The Defendants wastelessly encumber their pleading with a discussion of the fact that there was a conference held among the parties on January 6, 2023, and that the then Complaint was subsequently amended. See Defendants' Memorandum of Law at pp. 2-4. This serves no purpose, as the Court is to rule based upon the properly amended and filed Second Amended Complaint. Indeed, at the Conference counsel for the Defendants raised no objection to the proposed filing of an Amended Complaint. Whether such Amendment was due to the Court's "generosity" or not, is irrelevant, as the current, fully actionable Complaint is what sits before the Court at this time.

allegations of the complaint, it is not error for the district court to base its ruling <u>solely</u> on the allegations of the complaint.  See *Carter, supra*, 822 F.3d at 57.

B. Dismissal Under Rule 12(b)(6)

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  See *Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir. 2003); *Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir. 2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009), quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*, *citing Twombly, supra,* 550 U.S. at 556.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly, supra,* 550 U.S. at 555 (internal quotations, citations and alterations omitted).  As long as the plaintiff's allegations are plausible the court may not dismiss the complaint.  *Id.* at 570; *Iqbal, supra,* 556 U.S. at 680.

Therefore, for the purpose of the Defendants' motion to dismiss, this Court must accept as true all of the facts alleged in the Second Amended Complaint ["SAC"] (s*ee, e.g.*, *Bolt Elec. Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995)), and draw all reasonable inferences in favor of the Plaintiffs.  *See, e.g., Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004).  "[U]nless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief", the Defendants' motions to dismiss must be rejected. *Stewart v. Jackson & Nash*, 976 F.2d 86, 87 (2d Cir. 1992) (internal quotations omitted).

III. The Second Amended Complaint Complies With the Court's Order

Defendants complain that the red-lined version of the Amended Complaint (ECF No. 62), fails to comply with the Court's Order, and that the SAC improperly identifies Rachel Stiene as a Defendant. This is just plain wrong.

The Court, in its Order granting the Plaintiffs the opportunity to amend the Amended Complaint (ECF No. 20) stated the following,

> **the Court grants Plaintiffs leave to file a second amended complaint by January 16, 2024. Leave is granted <u>solely for the purposes of allowing Plaintiffs to remove the allegations discussed in their 55 November 26, 2023, letter and any other allegations (if any) that Plaintiffs may no longer believe they can make consistently with their obligations under Rule 11(b).</u>**

Docket entry, 01/09/2024. Boldface and emphasis in original.

In other words, (a) references denying that Mr. Lanasa had ever been convicted of a crime should be excised and (b) the Complaint should be corrected to properly identify Rahcel Stiene (and not Lois Stiene) as the second offending defendant. This is what was done. While the Defendants accuse the Plaintiff of "[s]neaking additions in" to the SAC (see DMOL at p. 2), and the Plaintiffs further "attempted to improperly sneak in allegations that added Rachel as a party" (*id*. at p. 4),[3] no such thing was done.

There was no "sneaking" done here. All that was done, with clear notations in the red-lined version, and the SAC, was to comply with the Court's Order. These changes are clearly marked, and the proof is that Defendants' counsels located the references as to Rachel Stiene with no difficulty.

---

[3] Defendants also claim that the Plaintiffs were "hiding affirmative additions" to the Second Amended Complaint. See Defs.' Memorandum of Law ("DMOL") at p. 4. Nothing has been hidden from either the Court or the Defendants. All that has been done, as the Defendants themselves acknowledge is to remove Lois Stiene as a Defendant and keep Rachel Stiene as a Defendant.

Such *ad hominem* accusations of the Defendants' counsel do nothing to move this case forward, and serve only to delay the final resolution on the merits. Hopefully in their Reply they will avoid this.

Furthermore, it is reasonable to assume that the Court, itself, can easily discern the changes made to the Amended Complaint, by comparing the redline version with the SAC.

To comply with this Order of the Court, there were no new allegations made, nor were there any new parties added to the litigation. Rachel Stiene was added as a party in the Amended Complaint, ECF No. 20. She was identified as "Lois Stiene, aka Rachel Stiene", as it was unclear who the identifiable party was who made the defamatory comments identified in ¶ 22 of the Amended Complaint. After this was clarified, the Amended Complaint was corrected to identify the offending party as "Rachel Stiene" or "R. Stiene". See SAC at ¶¶ 6, 22.

Rule 11(b), referenced by the Court, provides that the pleading should have "factual contentions [that] have evidentiary support". See Rule 11(b)(3). Referencing Rachel Stiene (corrected from Lois Stiene — based upon the representations in the Defendants' letter of November 20, 2023, ECF No. 57[4]) was a correction made to the pleadings consistent with Rule 11(b). Such "correction" is "consistent[] with [Plaintiffs'] obligations under Rule 11(b)" to make sure the pleadings are correct and supported with admissible evidence.

The Defendants complain about alleged errors in the SAC "that should have been stricken." See DMOL at p. 4. However, the Order from the Court only mandated that the references to Lois Stiene and the criminal conviction issue. These have been excised. Anything else is an issue for trial and discovery. Indeed, the Defendants are disingenuous in seeking to remove certain claims made in the

---

[4] It should be noted that at no time was any proof or even an affidavit provided that the proper party who engaged in the defamatory conduct was Rachel Stiene, and not Lois Stiene. The first Rule 12(b) Motion to Dismiss (ECF No. 32), contained no such affidavit; the only supporting sworn statement related to the issue of Mr. Lanasa's twenty-plus year old criminal conviction. See ECF No. 35). In fact, in the original Motino to Dismiss, Defendants acknowledged that "Rachel, is Erik's wife and sometimes sits in on Tenkar's Tavern and engages in dialogue with Erik during the course of the webcast." ECF No. 32 at p. 2.

SAC (*e.g.*, the tax status of Plaintiff Dungeon Hobby), but then objecting to referencing Rachel Stiene as the correctly named co-defendant.

Finally, the Defendants aver that the Plaintiffs have added allegations not contained in the Amended Complaint, in violation of the Court's Order. See DMOL at p. 4. And, refer to ¶ 22 in both the Amended Complaint (ECF No. 20), and the SAC (ECF No. 62). ¶s 22 in both Complaints are precisely the same, and reference precisely the same allegations of defamatory conduct save for (a) removing the reference to a criminal conviction, and (b) replacing Lois Stiene with Rachel Stiene where appropriate. Nothing has been added.

IV. Rachel Stiene is a Properly Named Defendant (Defendants' Argument II, pp. 8-9)

This is a wholly confusing claim by the Defendants' counsel. The question arises as to whether Defendants' Counsel represent Rachel Stiene. If they do, in this action, then the fact she has not been served with a Summons, is waived by her counsels' appearance on her behalf. The Defendants' counsel, from the start have made clear that they represent Erik, Lois and Rachel Stiene.[5] They have never made any claim that they do not. Indeed, the Defendants' counsel has made numerous representations, in its pleadings, on behalf of Rachel Stiene. *See, e.g.*, Motion to Dismiss, ECF No. 32. In fact, as per Rule 11(a) the only individuals signing the Motion to Dismiss are apparently Daniel Schneider and Robt. Lower. See Notice of Motion. Rachel Stiene did not sign it as she would have to under Rule 11(a). Since she has not signed the Notice of Motion, then the Court may either accept Rachel Stiene as a party to this action and Defendants' counsels representing her, or the Court may reject all arguments related to her. See *Oliver v. Precythe*, 2023 U.S. Dist. LEXIS 126800 at *1 (E.D. Mo. 2023); *Ghashiyah v. Frank*, 2008 U.S. Dist. LEXIS 18378 at *11-*12 (E.D. Wisc. 2008) ("Rule

---

[5] Indeed, this Motion has been made on behalf of the "Defendants" (plural), making clear that the moving counsels' are appearing on Rachel Stiene's behalf. See DMOL at pp. 1, 2, 5, 6, 9, 11-13, 15-19, 22, 27, 28, 30.

11(a) requires that any pleading, written motion, or other paper filed on behalf an unrepresented party must be signed by that party . . .").

Even more to the point is that the SAC was filed with the Court on January 16, 2024. Under Rule 4(m) of the F.R.Civ.P.,

> (m) Time Limit for Service. If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff— must dismiss the action without prejudice against that defendant or order that service be made within a specified time.

Thus, service of the Summons and Complaint can be made no later than April 25, 2024.

Certainly, in the interests of economy and it would serve all parties concerned if Defendants' counsel acknowledge that they represent Rachel Stiene. This is especially so, as she is referenced numerous times in the Defendants' Memorandum of Law. See *id*. at pp. 19-22, 25.

If the Defendants' counsel do not represent her, then any of the arguments made to dismiss as to Rachel Stiene should be dismissed until such time as she has separate counsel.

V. Dismissal Under Rule 12(b)(1) is Not Warranted — Section 1332 Provides No Basis for Dismissal (Defendants' Argument I, pp. 6-8)

Defendants assert that dismissal under Rule 12(b)(1) is mandated as the claim for damages are wholly conclusory. See Defendants' Memorandum of Law at pp. 6-8. This is wrong.

A plaintiff bears the burden of demonstrating to a "reasonable probability" that the $75,000 threshold has been satisfied. See *Tongkook Am., Inc. v. Shipton Sportswear Co.,* 14 F.3d 781, 784 (2d Cir. 1994). "This burden is hardly onerous," as the courts "recognize 'a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'" *Scherer v. Equitable Life Assurance Soc'y of U.S., supra*, 347 F.3d at 397, quoting *Wolde-Meskel v. Vocational Instruction Project Community Svces., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999). To rebut this presumption, a defendant must demonstrate "that the complaint 'was so patently deficient as to reflect to a legal certainty that [the plaintiff] could not recover the amount alleged or that the damages alleged

were feigned to satisfy jurisdictional minimums.'" *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006), quoting *Wolde-Meskel, supra*, 166 F.3d at 63. See also *St. Paul Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) ("It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."). The Second Circuit has set a high bar for overcoming the presumption: "'the <u>legal impossibility of recovery</u> must be so certain as virtually to negate the plaintiff's good faith in asserting the claim.'" *Scherer, supra*, 347 F.3d at 397, quoting *Chase Manhattan Bank, N.A. v. American Nat'l Bank & Trust Co. of Chicago*, 93 F.3d 1064, 1071 (2d Cir. 1996). Emphasis added. And, a Court is not "limited to the pleadings in overcoming this presumption, and . . .'may look outside the pleadings to other evidence on the record.'" *Gasery v. Kalakuta Sunrise, LLC*, 422 F. Supp.3d 807, 818 (S.D.N.Y. 2019), quoting *United Food & Commercial Workers Union Local 919, AFL-CIO v. Centermark Properties Meridien Square, Inc.*, 30 F.3d 298, 305 (2d Cir. 1994). "Moreover, there has been no argument presented or finding made that the jurisdictional allegations of the complaint were made in bad faith in an attempt to feign jurisdiction." *Wolde-Meskel, supra*, 166 F.3d at 63. As long as the damages claim is made in good faith, it satisfies the statutory requirement. See *Benning v. Corp. of Marlboro College*, 2014 U.S. Dist. LEXIS 107013 at *7 (D. Vt. 2014).

First of all, Plaintiffs set forth at least one lost business opportunity that caused the Plaintiffs to suffer economic loss, and that such loss immediately followed one of Defendants' Youtube® postings. As set forth in the Amended Complaint,

> 24. After Defendant posted this on Youtube® (*http://youtu.be/-sDfkispM9w*), Geek Nation® canceled a tour with the Plaintiffs, causing financial damages in payments to the Plaintiffs TSR and DUNGEON HOBBY, and attacking any one that supports said Plaintiffs.

The Plaintiffs further set forth the claim that it has suffered economic loss due to the actions of the Defendants that have caused both customers and potential employees/staff to turn away from working with the Plaintiffs, *viz.*,

75. Plaintiff has had creators, publishers, artists, and customers turn away from Plaintiff LANASA, and Plaintiffs TSR and DUNGEON HOBBY, stating that they are scared and angry, vowing not to work with Plaintiff due to the false, fabricated statements made by Defendant E. STIENE, and his followers.[6]

Clearly these are not conclusory allegations. They set forth specific instances of losses caused by the Defendants' actions. As stated above, the party opposing jurisdiction under a Rule 12(b) argument, must demonstrate "to a legal certainty" that the amount in damages claimed by the plaintiff cannot be met. This bar is one that has been repeatedly affirmed by the Courts. *See, e.g., Pena v. British Airways, PLC (UK)*, 849 Fed. App'x 13, 14 n. 1 (2d Cir. 2021); *Kruglov v. Copart of Connecticut, Inc.*, 771 Fed. App'x 117, 118 (2d Cir. 2019). As long as the Plaintiff has made a "good faith representation" that the amount in controversy exceeds the jurisdictional limits of Section 1332(a), then the statute has been satisfied. See *Adams v. Netflix, Inc.*, 726 Fed App'x 76, 78 (2d Cir. 2018), *cert. denied* — U.S. — (2019); *Suarez v. Mosaic Sales Solutions US Operating Co., LLC*, 720 Fed. App'x 52, 53 (2d Cir. 2018). See Lanasa Decaration annexed hereto as to lost business.

Instructive is the decision in *Feitosa v. Keem*, 2023 WL 2267055 (W.D.N.Y. 2023). There the plaintiff sued for defamation, based upon postings on the internet, alleging damages in excess of the $75,000 limitation under Section 1332(a). The defendant moved to dismiss under, among other things, Rule 12(b)(1). In denying relief under this Rule, District Judge Skretny stated the following,

> Here, Feitosa alleges that he suffered reputational injuries and mental anguish damages exceeding $75,000. (Amended Complaint, ¶¶ 3, 28.) He alleges that due to the Tweet, he suffered public shame, embarrassment, and humiliation; lived in fear due to threats of violence; had to spend time seeking to repair his reputation; experienced severe mental anguish and underwent mental health treatment; had trouble sleeping; and experienced anxiety at events in the social media/influencer industry. (Id.)
> In challenging jurisdiction, Keem argues that Feitosa's claims are insufficient because he does not allege that he lost YouTube subscribers or social media followers and does not ascribe a monetary value to the mental anguish he suffered. But these arguments do not meet Keem's burden of showing "to a legal certainty" that the amount recoverable does not meet the jurisdictional threshold. Resolving any doubts in favor of Feitosa's pleadings, this Court finds that he has sufficiently alleged damages in

---

[6] In Defendants' Counsels' Memorandum of Law, they cite numerous paragraphs in the SAC. *E.g.*, ¶¶ 14, 36, 55-56, 65-67, 81-82, 86-88, 93-94. If they had read the SAC with a little more care they would have also read ¶¶ 24 and 75, which clearly satisfy the requirements of Section 1332(a), and avoided this aspect of the Motion to Dismiss.

excess of $75,000 such that jurisdiction under 28 U.S.C. § 1332(a) is proper. *Id*. at *3.

Further, in *Wojtczak v. Safeco Property & Casualty Insurance Cos.*, 669 F. Supp.2d 305 (W.D.N.Y. 2009), Judge Siragusa dismissed a defamation case on the grounds of failure to satisfy the amount in controversy requirement of Section 1332(a) on the following basis,

> on the facts set forth above, the Court finds to a legal certainty that Plaintiff's defamation claim fails to meet the amount-in-controversy requirement. Plaintiff does not claim to have suffered any monetary loss from the incident, nor does he claim that the alleged defamatory statement caused any particular harm to his reputation or credit standing.

*Id*. at 314.

In the case at Bar the Plaintiffs, as set forth above, made a clear claim for damages based upon both lost contracts and lost revenue due to personnel issues, and business reputational damage. These allegations are sufficient and adequate under existing case law to satisfy the requirements of Section 1332(a)(1). They are not conclusory, nor are they ambiguous or vague. See Lanasa Declaration.

As the SAC makes clear,

> 86. The Plaintiffs TSR and DUNGEON HOBBY suffered serious trade and special damages and adverse actions due to the subject postings of the Defendants (see ¶¶ 24, 75), along with irremediable damage within the gaming community.
> 87. In addition, thereto, the postings have resulted in Plaintiff LANASA expending assets for medical and other support services such as counseling due to the posting of the Plaintiff's minor daughter.
> 88. These damages were "special damages", in the sense that they resulted in a direct pecuniary loss of income and business. See ¶¶ 24, 75 *supra*.

See SAC at ¶¶ 86 thru 88.

In *Carroll v. Trump*, 22-cv-10016 (S.D.N.Y.), the Plaintiff, set forth a claim for defamation based upon the defendant's published statements. In her cause of action for defamation, she set forth no specific calculation of damages, merely asserting that "Trump's false and defamatory statement caused Carroll to suffer reputational, emotional, and professional harm." See Verified Complaint at ¶ 135. This was sufficient to satisfy the amount in controversy. And, in *Carroll* the jury awarded

Plaintiff $2.7 million on the defamation claim. See ECF No. 174, annexed hereto as <u>Exhibit C</u>. Much more substance to support the amount in controversy exists in the case at Bar than in *Carroll*.[7]

VI. This Action is Not Subject to anti-SLAPP Statute (Defendants' Argument III, pp. 9-13)

As with most, if not all, parties who engage in defamatory conduct, the Defendants seek the refuge of the New York anti-SLAPP statute, in the belief that they can defame and libel with abandon, and not suffer the consequences of their tortious conduct. In fact, and law, the actions of the Defendants are not subject to the anti-SLAPP statute, and the Defendants must be called to task for their behavior provide remedy in both law and equity to the Plaintiffs. The Defendants argue that the anti-SLAPP statute precludes recovery by the Plaintiffs as applying it mandates a standard of "actual malice" to be established by the Plaintiffs. See DMOL at p. 10.

Even assuming that the anti-SLAPP is to be applied, the Plaintiffs have adequately pled "actual malice" on the Defendants' part. See discussion *infra*. The action of the Plaintiffs is not designed, contrary to the Defendants' assertion to "silenc[e] and intimidate[e] Defendants from speaking out publicly about Plaintiffs' bullying and conduct designed to chill others from speaking against them." *Id.* at p. 11. To accept this argument would be make any claims of so-called bullying and false conduct totally immune from tortious correction be hiding behind the statute.

In *Kessner v. Jones*, 2023 U.S. App. LEXIS 15255 (2d Cir. 2023), the Court of Appeals affirmed the lower courts dismissal of a defamation claim under Rule 12(b)(6). The court found that the action, against a publication, was precluded by, among other things, the "fair report privilege". *Id.* at *4-*5. With regard to the application of the anti-SLAPP statute, the Court, citing to the statute (N.Y. Civil Rights L. § 76-a) stated that a plaintiff must plead actual malice when it involves "any communication in a place open to the public or a public forum in connection with an issue of public interest; . . ." *Id.*

---

[7] Indeed, the jury in the second Trump defamation suit awarded the Plaintiff more than $83 million based, at least partially, upon Trump's continued repeating (as with Stiene) of defamatory statements. See *Carroll v. Trump*, 20-cv-07311-LAK.

at *5.  The key, however, is that the Civil Rights Law requires that the matter be one of "public interest".

The problem for the Defendants is that this is not a matter of "public interest".  The Defendants would have any publication made on the Internet a matter of public interest.  See DMOL at p. 12, making the unsupported claim that merely posting something on "forums on YouTube, Patreon, Facebook, Discord, and other online communication platforms are 'communication[s] in a place open to the public or a public forum in connection with an issue of public interest.'"  Such an interpretation of the statute would, rather than discouraging the dissemination of libelous material, actually encourage it.

It should be recognized that as a matter of analysis, the tortious statements of the Defendants must be analyzed in the context of what they specifically said regarding the Plaintiff, and whether they were designed to serve a "public interest".  Many of the cited libelous comments had nothing to do with the stated purpose of Tenkar's Tavern to discuss the Dungeons and Dragons community.[8]  These statements were directly addressed to the Plaintiff Lanasa as an individual, and had nothing to do with his businesses.  *See, e.g.*, SAC at ¶ 22, references and quotes from Feb. 8, 2022, Feb. 18, 2022, Mar. 17, 2022.  They serve no "public interest" nor do they relate, in any way, to Dungeons and Dragons followers.

The determination of whether speech involves a matter of public or private concern depends upon the totality of the circumstances. Courts must examine the content, form, and context of the speech, "as revealed by the whole record."  *Dun & Bradstreet v. Greenmoss Builders, Inc*., 472 U.S. 749, 761 (1985).  See also *McHerron v. Burnt Hills-Ballston Lake Central Schl. Dist.*, 778 Fed. App'x 54, 55

---

[8] Tenkar's Tavern, the Defendants' venue for on-line publishing, is described as "A blog focused on OSR gaming, the Swords & Wizardry RPG and all things Dungeons & Dragons. *Tavern* Chat is the accompanying Podcast."  See *https://www.tenkarstavern.com/*.

(2d Cir. 2019). Indeed, courts are to evaluate "what was said, where it was said, and how it was said." *Snyder v. Phelps*, 562 U.S. 443, 454 (2011). See *Huggins v. Moore*, 94 N.Y.2d 296, 302-03 (1999).

As to content, the Supreme Court has stated that speech addresses matters of public concern "when it can be fairly considered as relating to any matter of political, social, or other concern to the community" or when the subject is "of general interest and of value and concern to the public." *Snyder*, *supra*, 562 U.S. at 453. See also *Dongguk University v. Yale University*, 734 F.3d 113, 127-28 (2d Cir. 2013).

Thus, for example, in *Aristocrat Plastic Surgery, P.C. v. Silva*, 206 A.D.3d 26 (1ˢᵗ Dep't 2022), the Appellate Division found not actionable postings on certain websites that related directly to the medical care and treatment rendered by the plaintiff. The Court specifically held that "Defendant's posts concerning the plastic surgery performed upon her by Dr. Tehrani qualify as an exercise of her constitutional right of free speech and a comment on <u>a matter of legitimate public concern and public interest</u> — <u>namely, medical treatment</u> rendered by a physician's professional corporation and the physician performing surgery under its auspices . . ." *Id*. at 32.

See also *Gillispie v. King*, 217 A.D.3d 566 (1ˢᵗ Dep't 2023) (statements alleging plaintiff engaged in domestic violence subject to SLAPP statute as they were made on a podcast dedicated to issues of domestic violence); *Bhuiyan v. Chinta*, 2023 N.Y. Misc. LEXIS 12928 (S. Ct. Qns. Co. 2023) (Court finds that alleged defamatory statement made in on-line weekly newspaper relating to real estate, alleging "that the Plaintiff fraudulently induced individuals to enter real estate transactions and subsequently stole their money; used fake telephone numbers to conduct business; and carried out illegal investments", were subject to the anti-SLAPP statute as they related to "the integrity of the Plaintiff as <u>a real estate salesperson</u>". *Id*. at *9. Emphasis added.); *Amuze v. Better Business Bureau*, 2023 NYLJ LEXIS 651 at *6-*7 (S. Ct. N.Y. Co. 2023) (postings on BBB on-line forum regarding and relating to businesses practices subject to anti-SLAPP statute); *Kerns v. Ishida*, 2022 N.Y. Misc.

LEXIS 9265 at *2-*3 (S. Ct. N.Y. Co. 2023) ("This court finds that the online reviews posted on Google and Yelp . . . pertaining to Plaintiff's business, Orchid Aesthetics Medical Spa, constitute a matter of public concern."  Emphasis added.).

To apply the amended anti-SLAPP statute to this case will mean that the tort of libel will, for all practical purposes, disappear.  Any libelous statement can be couched in the cloak of "public interest", by merely stating, as the Defendants do now that any false accusation, no matter where or when it is published, is protected, or merits a heightened pleading standard.  Indeed, falsely accusing someone of being a pedophile similarly should be couched in terms of "public interest", or emailing multiple persons that a party produces and distributes child pornography would be similarly treated as "in the public interest", and hence only subject to an "actual malice" standard.  This absurdity is clearly not what the legislature intended.  *See, e.g., Reus v. ETC Housing Corp*., 72 Misc.3d 479 (S. Ct. Clinton Co. 2021), *aff'd* 203 A.D.3d 281 (3d Dep't 2022) ("the fate of the Gray Gables building which has been a matter of public concern for decades."  *Id*. at 486.).

## VII. Even Assuming the anti-SLAPP Statute is to be Applied, the Plaintiffs Have Established "Actual Malice" on Defendants' Part (Defendants' Argument IV,  pp. 13-18)

The Defendants claim that the Plaintiff, Justin Lanasa is a "public figure", and that the Plaintiffs have failed to adequately plead "actual malice" on the part of the Defendants.  This is wrong, and, in fact, Mr. Lanasa is not a public figure, and the actions of the Defendants clearly, and unmistakably constitute "actual malice".

"Actual malice" requires that a plaintiff establish, by clear and convincing evidence, that the published communication upon which the pleading was based "was made with knowledge of its falsity or with reckless disregard of whether it was false."  Civil Rights L. § 76-a(2).  See also *Coleman v. Grand*, 523 F. Supp.3d 244, 260 (E.D.N.Y. 2021).  "Reckless disregard as to falsity means that the statement is made with a high degree of awareness of the publication's probable falsity or while the defendant in fact entertained serious doubts as to the publication's truth."  *Albert v. Loksen*, 239 F.3d

256, 272 (2d Cir. 2001). See also *Dongguk University v. Yale University*, 734 F.3d 113, 123 (2d Cir. 2013). "Actual malice, even by way of recklessness, is . . . a difficult standard to meet, . ." *Biro v. Conde Nast*, 963 F. Supp.2d 255, 277 (S.D.N.Y. 2013), *aff'd* 807 F.3d 541 (2d Cir. 2015), *cert. denied* 578 U.S. 976 (2016). In accord see *McDougal v. Fox News Network, LLC*, 489 F. Supp.3d 174, 185 (S.D.N.Y. 2020) (recognizing that "[a]ctual malice is a high bar.").

However, as with all such pleading requirements, the devil is in the details, and portraying a party's actions as "actual malice" is not as simple as using these magic words. Indeed, "[d]espite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001), citing to *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991). As the High Court recognized in *Masson*, "We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation, and we continue to do so here. But the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one." *Ibid*. Emphasis added.

In recognition of the fact that "a defendant in a defamation action will rarely admit that she published the statements with actual malice," (*Biro, supra*, 807 F.3d at 545), proof of actual malice rests on objective facts, such as "the defendant's own actions or statements, the dubious nature of [his] sources, [and] the inherent improbability of the story, . . ." *Coleman, supra*, 523 F. Supp.3d at 260, quoting *Dongguk, supra*, 734 F.3d at 123.

For example, the repeated and constant focus on the Plaintiffs, in scores of Youtube® postings, which contained defamatory statements, is evidence of actual malice. See *Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 494 F. Supp. 505 (S.D.N.Y. 1980), *mdf'd on other grnds.* 646 F.2d 800 (2d Cir. 1981) (Judge Motley finding "actual malice" in the fact that the defendant repeated the alleged defamatory statements multiple times, and that "actual malice might be inferred from the

communications themselves, to the extent that they contained statements <u>aimed directly at Acme's reputation</u>." *Id*. at 507. Emphasis added.),

See also *Reynolds v. Pegler*, 223 F.2d 429 (2d Cir. 1955), *cert. denied* 350 U.S. 846 (1956) "Malice may be inferred from the very violence and vituperation apparent upon the face of the libel itself, . . ." *Id*. at 434.); *Delaware Valley Aesthetics, PLLC v. Doe 1*, 2022 WL 17094740 (E.D. Pa. 2022) ("Defendant's repeated statements showing ill-will and hostility towards Dr. Rumer and her surgical practice are sufficient evidence of actual malice." *Id*. at *9.). See also N. 7, *supra*.

In the case at Bar the Plaintiffs have laid out multiple actions of the Defendants that demonstrate their ill-will and actual malice as directed against the Plaintiffs. First of all, as demonstrated by the fact that the Defendants have not only posted defamatory statements on Youtube®, but also, as set forth in the SAC, among other locations. See SAC at ¶ 20, ECF No. 62.

In Plaintiffs' Rule 26(a)(1)(A) disclosure to the Defendants, as served on April 11, 2023, a total of seventy-five "Internet Postings of Defendant[s] Consisting of Defamatory/Libelous Statements Demonstrating Defendant[s] Actual Malice" See Exhibit A, annexed hereto. [9]

Other than this, is the fact that the Defendants have posted, without authorization or permission, pictures of the Plaintiff Lanasa's wife and minor child, and failed to remove these. The Defendant's feeble efforts to blur or remove the photos of these two persons (especially the minor child) further demonstrate the malicious intent that Stiene has in targeting the Plaintiff and his family. Notwithstanding that the Defendant was advised of the offending nature of this image in the original Cease and Desist letter (see Exhibit A to Complaint), and the fact that it is referenced in the SAC, it is still, to this date, available on the internet merely by using the Defendant's URL See SAC at ¶¶ 25-26. Such action, can only be described as clear and unmistakable malicious intent to harm the Plaintiff

---

[9] See also Exhibit B, setting forth the continued and repeated defamatory actions of the Defendants in the past year, notwithstanding the commencement of this lawsuit.

and his family. See *Iantosca v. Elie Tahari, Ltd.*, 2020 U.S. Dist. LEXIS 171512 at *8-*9 (S.D.N.Y 2020). In *In re White*, 551 B.R. 814 (S.D. Ohio 2016), the Court stated as to such behavior,

> "[A]n injury is willful and malicious where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Shcolnik v. Rapid Settlements, Ltd.*, 670 F.3d 624, 629 (5th Cir. 2012) . . . The State Court determined that all the elements of invasion of privacy were satisfied, which includes intentional publication. Certainly, <u>Mr. White had to intentionally post the photos to the website</u>; such an act cannot be done accidentally. In addition, the State Court found that Mr. White posted the nude photographs on a "'revenge porn' website." *Id.* <u>This Court finds that the act of posting pictures of such a private nature to a public website without authority to do so is substantially certain to cause harm. No other purpose can be served by doing so.</u>

*Id.* at 822. Emphases added.

The Defendants assert that the Complaint makes "a few scattershot attempts to allege actual malice", and then references eight separate paragraphs of the SAC that serve as demonstrable examples of such context. Whether eight paragraphs out of ninety-four is a "scattershot" or not, is an open question. *Cf.*, *Bourne v. Town of Madison*, 2006 U.S. Dist. LEXIS 88403 at *6 (D.N.H. 2006). But, more to the point is that these specific instances of actual malice, as committed by the Defendants, are clear and indisputable.

There can be little doubt that ascribing neo-Nazi connections and "gay bashing" to the Plaintiff, (see SAC at ¶ 58) and "gay bashing", directed at the Plaintiff and his businesses, constitute actual malice. See generally *Soobzokov v. Lichtblau*, 2016 WL 614411 at *2, n. 3 (D.N.J. 2016). While the Defendants attempt to minimize this accusation in their Memorandum of Law, their sole support has not to do with Mr. Lanasa, but a third-party, "Dave Johnson".[10] See Memorandum of Law at p. 24, where the Defendants go into excruciating detail about Mr. Johnson, and then, in a "guilt by association" manner, ascribe Mr. Johnson's supposed political views to those of the Plaintiff. Clearly,

---

[10] The Defendants claim that "Dave Johnson, who is professionally connected to Lanasa and/or TSR LLC". Defs.' Memorandum of Law at pp. 24-25. Yet no proof or evidence is provided, and even if such evidence is available, it is for a jury to decide if Mr. Lanasa shares these supposed views.

if this is the basis for this defamatory claim, the Defendant ought to have realized that it was not Mr. Lanasa but Mr. Johnson who had such political views.[11]

In addition, thereto, Paragraph 22 of the SAC lists, merely as examples, an additional 18 specific instances of defamatory conduct, from January through November 2022.[12]

That being said, even before the issue of "actual malice" needs to be established, is the fact that Mr. Lanasa is not a "public figure", subject to such heightened standard of proof. Reading the Defendants' Memorandum of Law, one would only come to the conclusion that anyone and everyone is a "public figure". However, Mr. Lanasa is only a "public figure" because the Defendant has converted him into such a persona —a self-serving action on the Defendants' part.

A plaintiff may be a public figure for general or limited purposes. In *Gottwald v. Sebert*, 40 N.Y.3d 240 (2023), the Court of Appeals defined how a public figure is determined, *viz.*,

> "The category of public figures is of necessity quite broad" . . .. At the same time, public figure status "is a matter of degree" . . . Certain individuals may be considered public figures for all purposes while others "may invite publicity only with respect to a narrow area of interest" and may fairly be considered public figures only <u>where the alleged defamation relates to the publicity they sought</u> . . . One becomes such a limited-purpose public figure through some "purposeful activity," by which the individual has "thrust" themself "into the public spotlight and sought a continuing public interest in [their] activities" . . .

*Id*. at 251. Citations omitted. Emphasis added.

---

[11] In further support of its argument, Defendants refer to "Lanasa's published manuscript". See Memorandum of Law at pp. 24-25. This so-called "manuscript" is not some political or social screed. It is a set of rules and advice for video and on-line gamers. Thirdly, it was authored by "Dave Johnson", not Mr. Lanasa. The referenced "manuscript" in the pending litigation in the Western District of Washington, *TSR, LLC v. Wizards of the Coast*, 21-cv-1705, was cited by the Defendants in support of its motion for a preliminary injunction. In response to that pleading, TSR's counsel submitted several documents refuting the "racist" and "homophobic" claims of the Defendant Wizards. See ECF Nos. 37 thru 40. The District Court denied the preliminary injunction, ruling — as is essential here — that "the evidence before the Court does not allow for a determination of the individual(s) responsible for creating and disseminating the Subpoenaed SFNG [*i.e.*, manuscript]." See Order Denying Preliminary Injunction, ECF No. 51 (Dec. 14, 2022). Thus, it is a question of fact as to whether the manuscript is racist, and to whom it should be ascribed. It is the position of the Plaintiffs herein, that this ruling in the *TSR v. Wizards of the Coast* is the law of the case on this issue (or a matter of issue preclusion; see *Sanders v. Sanders*, 2022 WL 16984681 at *1 (2d Cir. 2022) ("in resolving motions based on issue preclusion, courts are permitted to take judicial notice of judgments and filings in related litigation, as long as they look to such documents to determine the scope of what was previously litigated and decided, not as evidence of the relevant events discussed therein.")), and binding upon this Court, leaving it up to a jury to decide who is responsible for the manuscript, and the language therein. A copy of the Court's decision is annexed hereto as <u>Exhibit D</u>.

[12] See also <u>Exhibit A</u>, and <u>Exhibit B</u>, annexed hereto.

A party may become "a public figure by virtue of his purposeful activity amounting to a thrusting of his personality into the 'vortex' of <u>an important public controversy</u>." *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 222 (S.D.N.Y. 1993), quoting *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, *reh'g denied* 389 U.S. 889 (1967). See *White v. Tarbell*, 284 A.D.2d 888, 889 (3d Dep't 2001).

The test as to a "public figure", limited or otherwise, is that the individual has "voluntarily inject[ed themselves] or is drawn into <u>a particular public controversy</u> and thereby becomes a public figure for a limited range of issues". *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

Furthermore, a "public controversy" is defined as follows,

> The Second Circuit has defined a public controversy as "any topic upon which sizeable segments of society have different, strongly held views," even if the topic does "not involve political debate or criticism of public officials." *Lerman* [*v. Flynt Distributing Co.*,] 745 F.2d [123,] at 138 [(2d Cir. 1984)]; *Waldbaum v. Fairchild Publications, Inc.*, [627 F.2d 1287 (D.C. Cir. 1980)] an oft-cited D.C. Circuit case, defined a public controversy as a "real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." 627 F.2d [at 1296], . . . The *Waldbaum* court advised that "to determine whether a controversy indeed exists and, if so, to define its contours, [a court] must examine whether persons actually were discussing some specific question." *Waldbaum*, 627 F.2d at 1296.

*Elliott v. Donegan*, 469 F. Supp.3d 40, 49 (E.D.N.Y. 2020). Citations omitted.

Mr. Lanasa fails to fit into this category. First of all, while Mr. Lanasa did run for public office in North Carolina (see DMOL at p. 15), these actions have absolutely nothing to do with the case at Bar. In the case at Bar Mr. Lanasa is suing Defendant Stiene, a resident of Queens, NY. The Defendant's actions all occurred in New York, and had nothing to do with any public office election in North Carolina. The fact that he ran for public office can hardly can be deemed to transform him into a "public figure".[13] Only when an individual, who has run for public office, is suing for

---

[13] Defendants also reference what they state are allegedly public actions of the Plaintiff which "include forcing female employees to wrestle one another in bikinis in order to obtain a promotion and publication of patently racist materials." And, here cite to a newspaper story in the Wilmington, N.C. *News & Observer* of February 25, 2020. See Defs.' Memorandum of Law at p. 15. However, the story at that link contains no indication, whatsoever, that any employees of the Plaintiff were coerced or forced into the subject conduct, nor even that Plaintiff Lanasa was responsible for the subject video or what it contained. Further, the case cited by Defendants, *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280 (4th Cir. 2008), is inapposite as (a) it was decided under Virginia law, not N.Y. law, and (b) more importantly, the alleged

defamation or libel, and such suit relates to the subject election, may he or she be considered a "public figure". See generally *Johnson v. Staten Isl. Advance Newspaper, Inc.*, 2004 N.Y. Slip Op. 51904(U) at \*2-\*3 (Civ. Ct. Richmond Co. 2004). *Cf.*, *Madarassy v. Saratogian Div. of Gannett Satellite Information Network, Inc.*, 1995 WL 263511 at \*3 (S. Ct. Saratoga Co. 1995).

Furthermore, any statements made by Plaintiff Lanasa, on the Defendants' Youtube® channel, were solely and exclusively in <u>response</u> to the slanderous statements of the Defendants. Lanasa's self-defense actions were merely an attempt to defend himself from the tortious conduct of the Defendants.

The Defendants also fail to establish precisely what "public controversy" (an essential element under *Lerman*) it was that the Plaintiff had injected himself into. The only public controversy, into which the Defendants claim that Mr. Lanasa has injected himself into, are wholly unrelated to the case at Bar. See DMOL at pp. 14-15. Indeed, the case cited for authority by the Defendants, *Schwartz v. American College of Emergency Physicians*, 215 F.3d 1140 (10th Cir. 2000), involved actions by the Plaintiff <u>directly related</u> to his cause of action for defamation. *Id*. at 1145. And, the same is true regarding *Jankovic v. Int'l Crisis Group*, 822 F.3d 576 (D.C. Cir. 2016), see *id*. at p. 15, n. 18. See *Jankovic, supra*, 822 F.3d at 588, where the Court stated, "For Zepter to be a limited-purpose public figure, he must have 'thrust' himself to the 'forefront' <u>of the public controversy at issue</u>." Emphasis added. Thus, in the context of the case at Bar, Mr. Lanasa is not a "public figure" — limited or otherwise.

## VIII. The Asserted Examples of Defamation and Libel are Actionable Under the Law (Defendants' Arguments V & VI, pp. 18-23, 23-26)

The Defendants take the position that the published statements made by them are not actionable

---

defamatory statements related to a clear matter of public interest, allegations of participation in torture at the Abu Ghraib prison in Baghdad. *Id*. at 283-92. In addition, thereto, the footnote (n. 15) of the Defendants states that the Plaintiff posted, on-line, in support of him being a "public figure" supposedly actions of an "abhorrent racist content". Yet, once again, these have no basis for transforming Lanasa into a "public figure.

as defamation or libel. See DMOL at pp. 18-26. In both fact and law, the examples set forth in the SAC are a valid basis for such a tortious claim. Furthermore, assertions that "truth is an absolute defense", are inappropriately made at this pre-discovery stage;[14] such a position is better made in either a Rule 56 Motion after the conclusion of discovery, or at trial before a jury.

"In determining the sufficiency of a defamation pleading, we consider whether the contested statements are reasonably susceptible of a defamatory connotation." *Davis v. Boeheim,* 24 N.Y.3d 262, 268 (2014). To be "reasonably susceptible of a defamatory connotation, 'the statements in question' must come within the well-established categories of actionable communication." *Id.* And, significantly, they must be evaluated in the context and forum in which they are made. "[T]he Court of Appeals of New York has consistently focused its analysis on the overall context in which the complained-of assertions were made." *Flamm v. Am. Ass'n of University Women*, 201 F.3d 144, 153 (2d Cir. 2000). This "context" factor includes not only "the immediate context in which the disputed words appear," but also "the larger context in which the statements were published, including the nature of the particular forum." *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995).

In the case at Bar all of the published statements were made on Defendants' dedicated internet channel to the Dungeons and Dragons community. See discussion at N. 10, *supra*. They were thus, and must be viewed, in the context of an attempt to not only cause reputational harm to the individual Plaintiff, Justin Lanasa, but also damage the business entities of TSR and Dungeon Hobby.

Under New York law, a claim for defamation must allege "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and, it must either cause special harm or constitute defamation per se." *Dillon v. City of New York,* 261 A.D.2d 34, 38 (1st Dep't 1999). "[S]ince only assertions of fact are capable of being

---

[14] While discovery has technically been concluded, Plaintiffs have a pending motion to depose Mr. Stiene and Mrs. Stiene. See ECF No. 59. Furthermore, as the Court is well aware, the Defendants have yet to file an Answer, assert any Affirmative Defenses, or make any Counter- or Cross-Claims.

proven false," a defamation claim therefore must be "premised on published assertions of fact, rather than on assertions of opinion." *Sandals Resorts Int'l Ltd. v. Google, Inc.,* 86 A.D.3d 32, 38 (1st Dep't 2011). And, merely couching a statement as an opinion, does not automatically immunize it from liability. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990).

In *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 289-90 (1986), the New York Court of Appeals explained the legal distinction between fact and opinion as follows:

> A "pure opinion" is a statement of opinion which is accompanied by a recitation of the facts upon which it is based. An opinion not accompanied by such a factual recitation may, nevertheless, be "pure opinion" if it does not imply that it is based upon undisclosed facts. When, however, the statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a "mixed opinion" and is actionable. The actionable element of a "mixed opinion" is not the false opinion itself-it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking.

However, on a practical real-world basis, "[d]istinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task." *Sandals, supra,* 86 A.D.3d at 39. Courts rely on three factors in making the distinction: "(l) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Davis, supra,* 24 N.Y.3d at 270. The "key inquiry is whether challenged expression, however labeled by defendant, would reasonably appear to state or imply assertions of objective fact." *Immuno AG v. Moor-Jankowksi,* 77 N.Y.2d 235, 243 (1991).

The contextual factor, which is often dispositive, "lends both depth and difficulty to the analysis, and requires that the court consider the content of the communication as a whole, its tone and apparent purpose." *Id.* Consistent with this holistic approach, "[r]ather than sifting through a communication

for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the [plaintiff]." *Id.*

Applying the principles outlined by the New York Courts, the proffered statements in the Plaintiffs' SAC are all valid examples of defamatory conduct. And, fully comply with the strictures of CPLR Rule 3016(a)[15], which states, "In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally."

The Plaintiff has laid out a number of published statements of the Defendants, all of which satisfy the statutory and case law as to defamation and libel. First of all, it should be noted, that at no time does either Defendant deny that they have published these statements. As to the following, the case law is clear — they constitute actionable defamatory statements (see SAC at ¶ 22):

> **January 08, 2022:**
> In accusing Plaintiff LANASA of dishonesty, E. STIENE stated that Plaintiff LANASA was "<u>inadvertently</u> honest, I don't think that was your intention" 04:57. Emphasis added.
> *https://www.youtube.com/watch?v=wDl3Wo6WTuU*

A published accusation of a party being dishonest, especially when the victim is a commercial enterprise, is actionable defamation. See *Divet v. Reinisch*, 169 A.D.2d 416 (1st Dep't 1991). In accord see *Zervos v. Trump*, 59 Misc.3d 790, 798 (S. Ct. N.Y. Co. 2018), *aff'd* 171 A.D.3d 110 (1st Dep't 2019), *appeal dism'd* 36 N.Y.3d 1083 (2021). See also *McNamee v. Clemens*, 762 F. Supp.2d 584 (E.D.N.Y. 2011) ("an attack on a person's integrity by impugning his character as dishonest or immoral may form the basis of a defamation if an ordinary listener would tend to credit the statements as true." *Id.* at 602.).

> **January 08, 2022:**
> Accusing Plaintiff LANASA of not paying his employees and hires:

---

[15] See *Sokol v. Leader*, 74 A.D.3d 1180, 1181-82 (2d Dep't 2010).

"the new artist got paid for it, but <u>Greg Bell did not</u>" 07:05.  Emphasis added.
*https://www.youtube.com/watch?v=wDl3Wo6WTuU*

An accusation of a failure to pay an employee or independent contractor goes directly to an accusation of dishonesty or fraud.  See *Stih v. Rockaway Farmers Market, Inc.*, 2023 WL 2760492 at *6-*7 (E.D.N.Y. 2023); *Reserve Solutions, Inc. v. Vernaglia*, 438 F. Supp.2d 280, 289 (S.D.N.Y. 2006).

> **January 09, 2022:**
> E. STIENE knowingly mis-represented the Plaintiff DUNGEON HOBBY, having
> the purpose of accepting gamers donations:
> "wasn't a not for profit, was for profit" 03:16
> *https://www.youtube.com/watch?v=AbpJ-djtNk0*

An accusation of fraud, which this statement was, is a valid basis for a libel claim under New York law.  See *Grimaldi v. Schillaci*, 106 A.D.2d 728 (3d Dep't 1984) ("letter portrays plaintiff as a businessman who is not entirely honest because he attempted to maintain control of equipment to which he knew he had no right. Such imputation of dishonesty could affect plaintiff in his business and, thus, constitute libel per se."  *Id*. at 729-30.).  See also *Daniels v. Provident Life & Casualty Ins. Co.*, 2002 WL 31887800 at * 4 (W.D.N.Y. 2002). (published claims of alleged fraud by plaintiff actionable as libel).  And, an assertion of fraud comes within the ambit of accusing a party of "engaging in criminal conduct".  See SAC at ¶ 28.

Similarly, labeling a person as a "Nazi", or a "Nazi sympathizer", or hiring a Nazi in his company, published in the context in which we are dealing here, is not protected speech or merely name calling.  See *Hryhorijiv (Grigorieff) v. Winchell*, 180 Misc. 574, 575 (S. Ct. N.Y. Co. 1943), *aff'd* 267 A.D. 817 (1st Dep't 1944).  See generally *Karl Reeves v. Associated Newspapers*, 2021 N.Y. Misc. LEXIS 11084 (S. Ct. N.Y. Co. 2021) (referring to plaintiff as "a "self-described, and proud of it, Neo Nazi, racist, homophobic domestic violence abuser, child abuser", protected from defamation claim based only on Civil Rights L. § 74, granting immunity for statements made in judicial proceedings, *id*. at *27).  In the case at Bar Stiene stated that "you included a Nazi in your company."  See SAC at ¶ 22.

[25]

Such an unproven accusation is actionable defamation and not a mere opinion. "[F]alsely attributing specific biased statements or _actions_ to a plaintiff may give rise to a claim for defamation . . ." *Bacon v. Nygard*, 2019 N.Y. Misc. LEXIS 3987 at *23 (S. Ct. N.Y. Co. 2019), *aff'd* 189 A.D.3d 530 (1st Dep't 2020). The key here is that not only was the Plaintiff tarred with this epithet, but accused of acting on it. "[F]alsely attributing specific biased statements or _actions_ to a plaintiff [for example, hiring a Nazi sympathizer] may give rise to a claim for defamation." *Bacon*, *supra*, at *18, citing to *Herlihy v. Metropolitan Museum of Art*, 214 A.D.2d 250, 254 (1st Dep't 1995). Emphasis added.

As to the issue of published statements of doxing by Stiene (SAC at ¶¶ 22, 92). As one court has stated, "The "goal of doxxing is typically retribution, harassment or humiliation." *Vangheluwe v. Got News, LLC*, 365 F. Supp.3d 850, 859 (E.D. Mich. 2019). In accord see *Greer v. Carlson*, 2020 U.S. Dist. LEXIS 190499 at *4, n. 5 (S.D.N.Y 2020). See also *Edelman v. United States,* 2020 U.S. Dist. LEXIS 228334 at *7, n. 5 (E.D.N.Y 2020) ("'Doxxing' is a slang term referring to 'publicly identify[ing] or publish[ing] private information about (someone) especially as a form of punishment or revenge.'".).

IX. Plaintiffs Have Set Forth a Valid Claim for Intentional Infliction of Emotional Distress
(Defendants' Argument VII, pp. 26-27)

The Defendants assert that a valid claim for the tort of intentional infliction of emotional distress cannot stand as it arises also from the same conduct as the claims for defamation. See DMOL at pp. 26-27. It is also claims that even on a substantive basis, such a tort cannot stand. *Ibid*. The Defendants are in error and a valid basis for this tort exists.

To prevail on a claim of intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must show (i) extreme and outrageous conduct, (ii) intent to cause, or disregard of a substantial likelihood of causing, severe emotional distress, (iii) a causal connection between the conduct and injury, and (iv) severe emotional distress. *Bailey v. New York Law School*, 2021 WL 5500078 at *5 (2d Cir. 2021), *cert. denied* — U.S. — (2022), quoting *Rich v. Fox News Network*, 939

F.3d 112, 122 (2d Cir. 2019). While the standard is considered to be "rigorous and difficult to satisfy" (*Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993)), when the alleged facts in a complaint lay out the basis for such a tortious claim the matter is clearly one for a factfinder (*i.e.*, jury) to determine.

In SAC ¶¶ 68 thru 82, the Plaintiffs lay out the bases for this tort claim. As set forth therein, the Plaintiffs assert several independent bases for this claim. First of all, there is the posting, on line, of the photographs of the Plaintiff Lanasa's wife and minor child. See *id*. at ¶ 70. This photograph, which is partially reproduced in the Complaint (see ¶ 26) makes clear the identity of both Mr. Lanasa's wife and small daughter. As referenced above, even to this date, the Defendants have kept this video up, for anyone to see, and use. The potential harm to the Plaintiff and his family is unmistakable. With the proliferation of deepfake technology, almost anyone, so desiring, could abduct the image of Mr. Lanasa's daughter and convert into use for unlawful purposes. See discussion in *United States v. Tatum*, 2023 U.S. Dist. LEXIS 75482 at*2-*4 (W.D.N.C. 2023) (discussing the use of such technology to use clothed images of children and convert them into child pornography).[16] Further, the potential for harm was early on sent to the Defendant Stiene in the initial Cease and Desist Letter sent on July 29, 2022. See Exhibit A to Complaint. Yet, this was completely ignored, clearly demonstrating Stiene's intentional conduct.[17]

Yet this was not the only example of Stiene's desire to inflict emotional distress upon the Plaintiff. As set forth in ¶ 73 of the SAC, Stiene made direct threats to safety and well-being of the Plaintiff's family. Stiene, who repeatedly spoke his alleged former life as a police officer,[18] with the clear suggestion that he owns a firearm, stated "I hope they like lead because I have plenty to offer if that

---

[16] See also Hsu, *As Deepfakes Proliferate, Nations Struggle to React*, THE NEW YORK TIMES (Jan. 23, 2023); Wang, M., *Comment: Don't Believe Your Eyes: Fighting Deepfaked Nonconsensual Pornography with Tort Law*, 2022 U. CHI. LEGAL FORUM 415-16 (2022).

[17] Indeed, the feeble attempt to distort the image of Mr. Lansa's wife and daughter, when the ability to do so is extremely easy, further demonstrates Stiene's careless, knowing and intentional desire to cause harm to the Plaintiff and his family.

[18] The realistic potential for harm, and the existence of a threat causing emotional distress is further exacerbated by the fact that retired N.Y.P.D. officers are given special permission to apply for, and receive, a license to both own and carry a firearm. See N.Y.C. Charter § 460(h).

is the case". He than goes on to say, as a clear threat, "I already know your address; I already know your fucking phone number; I know your wife's phone number." *Ibid*.

It is clearly arguable that these threats come within the penumbra of New York's "Red Flag" law. Enacted in 2019, this provides that "a petitioner who is a police officer or district attorney shall file such application upon the receipt of credible information that an individual is likely to <u>engage in conduct that would result in serious harm to himself, herself or others, . . .</u>" CPLR § 6341.[19]

In the SAC, the Plaintiff states, regarding the subject Cause of Action,

> 77. These actions caused severe and possibly irremediable emotional and psychological strain within Plaintiff LANASA'a family by these attacks. A result of which, has been that the Plaintiff, and his family, have been compelled to seek outside counseling.

To support this Cause of Action, in the Plaintiffs' Rule 26(a)(1)(A)(i), has named both the therapist as a witness to testify, at trial, and his wife, as to the emotional harm that the Defendants actions have caused. And, has set forth expenditures made to a therapist. See Lanasa Declaration.

Here, all of the elements have been satisfied such that pre-discovery dismissal is not warranted — the wanton posting of the Plaintiffs wife and daughter on the Defendants' Youtube® site, claims that the Defendant knew where the Plaintiff lives, the assertion that the Defendant is a former police officer (and may well own a firearm), the naming of a mental health professional who has been caring for the Plaintiff's family as a result of these threats, the refusal to take down the offending video, even after having been notified of the harm, and the repeated and clear threats — all of these actions make for a valid claim of intentional infliction of emotional distress to survive a Rule 12 Motion to Dismiss. *See, e.g., Allen v. Meyers*, 2011 WL 721648 at *6 (S.D.N.Y. 2011).

---

[19] Whether the statute is constitutional or not is open to question. In *G.W. v. C.N.*, 78 Misc.3d 289 (S. Ct. Monroe Co. 2022), the Court held the statute unconstitutional. See also *R.M. v. C.M.*, 79 Misc.3d 250 (S. Ct. Orange Co. 2023). A contrary result was found in *J.B. v. K.S.G.*, 2023 WL 2851170 (S. Ct. Cortland Co. 2023). See also discussion in *Spickler v. K.B.*, 2024 N.Y. Misc. LEXIS 233 at *4-*8 (S. Ct. Albany Co. 2024). However, these rulings do not negate the serious and more than reasonable threat to the safety of the Plaintiff's family, based upon Stiene's knowing and wholly irresponsible statements; the point being that Stiene's comments clearly come within the type of behavior the "Red Flag" law is designed to prevent.

X. Plaintiffs' Cause of Action for Prima Facie Tort (Defendants' Argument VIII, pp. 28-29)

In Cause of Action Fourth the Plaintiffs assert *prima facie* tortious conduct on the part of the Defendants. SAC at ¶¶ 83 thru 94. In that Cause of Action, the Plaintiffs set forth several specific actions of the Defendants that support such a claim. See *id*. at ¶¶ 88 thru 91. These actions include not only the unauthorized and continued on-line publishing of the Plaintiff's wife and minor child, but also specific statements made on-line by the Defendants.

The requisite elements for a cause of action sounding in prima facie tort include (1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, (4) by an act or series of acts which are otherwise legal. *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984).

With regard to the publication of the Plaintiff's wife and child images, significantly, the Defendants, in their pleading, at no time dispute the Plaintiffs' claim that such actions, not only violated Youtube®'s Terms of Service, but also constituted a violation of Civil Rights L. §§ 50,[20] 51.[21] SAC at ¶ 89. See *Matsuba v. Hernandez*, 2023 N.Y. Misc. LEXIS 763 at *4-*5 (S. Ct. N.Y. Co. 2023). This was not, however, the basis for this cause of action. What was, "was that defendants were motivated solely by malevolence", in the Defendants continued refusal to delete these images. See *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 332 (1983). This "malevolence, is clearly demonstrated by Defendants (a) posting of the image of the Plaintiff's small daughter, and then (b) refusing to delete it.

---

[20] Section 50, provides as follows, "A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor." In ¶ 18 of the SAC it is alleged that "Upon information and belief, the Defendant E. STIENE maintains this sight as a commercial site, selling subscriptions and products through Amazon® . . ." At no time does the Defendant, in their pleading, deny this. And, the SAC makes clear that the use of such images was meant to enhance the Defendants' commercial enterprise. See generally *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 138-39 (1985).

[21] Section 51, provides that any party, whose right to privacy has been violated under Section 50, may sue for both equitable and damages relief.

Furthermore, several postings of the Defendant come within the penumbra of actionable *prima facie* tort. For example, on February 18, 2022, Defendant threatened the Plaintiff with physical violence: "jackass comes to my house; I hope they like lead because I have plenty to offer if that is the case". SAC at ¶¶ 73, 92. Such threats come within actionable prima facie tort. *Novak v. Rubin*, 129 A.D.2d 780, 781 (2d Dep't 1987) (*prima facie* tort cause of action sustained based upon defendant's alleged telephone threat to plaintiff's wife).

Defendants other published claims were clearly aimed at causing the Plaintiffs to suffer economic harm. See Lanasa Decl. setting forth losses attributable to Defendants' actions. Threats of "doxing", when designed to harm another, in the context of the Plaintiffs business, were made repeatedly by the Defendants. SAC at ¶ 92. This is the purposeful publishing of personally identifiable information about an individual with the intent to harm them.[22] By publishing the images above, and the threats such as "I already know your address; I already know your fucking phone number; I know your wife's phone number.", (SAC at ¶ 73), the Plaintiffs have satisfied the *prima facie* tort element of both intentionally causing harm and doing so without justification.

XI. Conclusion

For the reasons set forth herein, the Plaintiffs respectfully request that the Court deny the Defendants' Motion to Dismiss, and Motion for Attorney Fees and Costs.

Dated: Jan. 30, 2024
      Somers, NY

                                   Respectfully submitted,

                                   */s/ Bernard V. Kleinman*
                                   Bernard V. Kleinman, Esq.
                                   Law Office of Bernard V. Kleinman, PLLC
                                   Attorney for Plaintiffs

---

[22] *https://www.fortinet.com/resources/cyberglossary/doxing*. See also discussion at p. 26, *supra*.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

===========================================

JUSTIN LANASA, TSR, LLC, and        :
DUNGEON HOBBY SHOP MUSEUM, LLC,     :     Case No. 22-cv-05686-KAM-VMS

       Plaintiffs,        :

     — versus —        :     Declaration

       :

ERIK STIENE, RACHEL STIENE        :

       Defendants.        :

===========================================

STATE OF NORTH CAROLINA}
COUNTY OF New Hanover    }     *s.s.*:

1. I am JUSTIN LANASA, the Plaintiff herein.

2. I submit this Declaration in support of the annexed pleading as filed by my attorney, Bernard V. Kleinman.

3. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that the following is true and correct to the best of my knowledge.

4. Below is my estimate of lost revenues and expenses incurred as a direct and proximate result of the actions of the named Defendants in defaming me, and my businesses, and causing emotional trauma to my family, as set forth in my Complaint.

5. Lost business attributable to Defendants' actions (references are to conferences and meetings related to the Plaintiffs' businesses which I have been precluded from entering due to Defendants' actions:

    https://garycon.com/ - 2021, 2022, 2023, 2024

    https://www.gencon.com/ - 2021, 2022, 2023, 2024

    https://www.originsgamefair.com/ - 2021, 2022, 2023, 2024

https://www.gama.org/page/gama-expo - 2021, 2022, 2023, 2024

https://www.davecon.net/ - 2021, 2022, 2023, 2024

Geek Nation Tours canceled all future bookings with Dungeon Hobby due to negative postings by Defendants.

6. Attorney fees and costs expended due to actions of the Defendants of more than $135,000.

7. Costs associated with family counseling and related services due to postings of the Defendants related to my family.

8. Total losses estimated to exceed $160,000.00.

Dated:     Jan. 30 , 2024

JUSTIN LANASA

████████████

Rule 26(a)(1)(A)(ii) Disclosure
Internet Postings of Defendant[s] Consisting of Defamatory/Libelous Statements
Demonstrating Defendant[s] Actual Malice

https://youtu.be/ZJ-sv0LGiuE   Oct 15, 2020
https://youtu.be/ZDV2b0e0YVk   Oct 15, 2020
https://youtu.be/ffoo26nEhx8   June 17 2021
https://youtu.be/MBOYVG-aL54   June 21, 2021
https://youtu.be/VJpS_H-M-lI   June 22 2021
https://youtu.be/FDbU_nCJnbk   June 23 2021
https://youtu.be/t0FwF9_XwtY   June 24 2021
https://youtu.be/QqCWkHQHLkI   June 26 2021
https://youtu.be/1Nr0c1sheo0   July 7, 2021
https://youtu.be/qjIi5LGOuFI   July 9 2021
https://youtu.be/-e2EUHUGbIc   July 29 2021
https://youtu.be/GxY_W55PsaE   Aug 19 2021
https://youtu.be/jjTvNycNpqw   Aug 30 2021
https://youtu.be/JKWf-tBI1Hg   Sept 6 2021
https://youtu.be/gKYIhMltLnU   Sept 19 2021
https://youtu.be/skGiuemsC2w   Sept 23 2021
https://youtu.be/HjlOxyBhEBY   Oct 21 2021
https://youtu.be/wbDFRQBnclw   Oct 25 2021
https://youtu.be/YWWSA2heW2Y   Oct 28 2021
https://youtu.be/ASOtt4tF4nw   Nov 12 2021
https://youtu.be/cUg9mJLuj-0   Dec 8 2021
https://youtu.be/FbJfO0e09Nc   Dec 9 2021
https://youtu.be/ElWEkQfr7cM   Dec 10 2021
https://youtu.be/VBwUlZk_J50   Dec 12 2021
https://youtu.be/Nvlx0T-fsJo   Dec 13 2021
https://youtu.be/FKUptMIAEGw   Dec 26 2021
https://youtu.be/m1qwY5Lblp8   Jan 3 2022
https://youtu.be/cIcx-rZgSZI   Jan 4 2022
https://youtu.be/g49lUPQBK58   Jan 7 2021
https://youtu.be/wDl3Wo6WTuU   Jan 8 2022
https://youtu.be/AbpJ-djtNk0   Jan 9 2022
https://youtu.be/0sAMftZTSt0   Jan 14 2022
https://youtu.be/dYlhHRxLyrE   Jan 16 2022
https://youtu.be/UTr6BqwDKRo   Jan 24 2022
https://youtu.be/VOxNWJ08spQ   Jan 25 2022
https://youtu.be/mvqHZTtyc6o   Jan 31 2022
https://youtu.be/ZJDAtBlR6vc   Feb 8 2022
https://youtu.be/p0f2FkH-GZ4   Feb 13 2022

https://youtu.be/diTO55NTyvM  Feb 15 2022
https://youtu.be/hxsDOlDPkDc  Feb 18 2022
https://youtu.be/MkUpFrAsseA  Feb 22 2022
https://youtu.be/bYdqbe9KU6o  Feb 24 2022
https://youtu.be/C4Lgw1S1tlo  Feb 26 2022
https://youtu.be/gy2NE7zCAjw  Mar 6 2022
https://youtu.be/ww94qDNy-co  Mar 8 2022
https://youtu.be/yLq9U2ky67g  Mar 10 2022
https://youtu.be/uH9pk2y5NHo  Mar 13 2022
https://youtu.be/1jrrJ8vItWs  Mar 14 2022
https://youtu.be/pSbVzLby37w  Mar 17 2022
https://youtu.be/_L381qEwEz4  Mar 21 2022
https://youtu.be/Xk6AyDCmVLk  Mar 24 2022
https://youtu.be/mfgq56eVRPY  Mar 29 2022
https://youtu.be/8PSZGEOXlPs  Apr 4 2022
https://youtu.be/HCJlJ2Apk1A  Apr 5 2022
https://youtu.be/mMcvyJb4p_8  Apr 7 2022
https://youtu.be/qv17fb1LzLU  Apr 9 2022
https://youtu.be/Rs-5OU-RpG0  Apr 12 2022
https://youtu.be/U1uDbdxG4VU  Apr 14 2022
https://youtu.be/HKwdLcuJQfw  Apr 19 2022
https://youtu.be/rF53aEDAakY  Apr 28 2022
https://youtu.be/bJ_2oqzFtkU  Apr 29 2022
https://youtu.be/YtFIIqhJQRA  May 10 2022
https://youtu.be/BLn6Zb_UyMs  May 15 2022
https://youtu.be/LnYx63faYuY  May 16 2022
https://youtu.be/f4qUp1DVmr8  May 17 2022
https://youtu.be/uqKNEBr9bcg  May 24 2022
https://youtu.be/zugnTqZ0DdM  May 26 2022
https://youtu.be/qkpDy7DJhKw  May 28 2022
https://youtu.be/F8CvlndLQo8  June 7 2022
https://youtu.be/l5gffYawjCQ  June 9 2022
https://youtu.be/-sDfkispM9w  June 13 2022
https://youtu.be/djYL3joFZqQ  June 15 2022
https://youtu.be/oZOAW1d4XxA  June 16 2022
https://youtu.be/hjOSwJd6ZXM  June 18 2022

## Exhibit B

https://youtu.be/ZIayYQB3z-A May 12, 2023, time 8:20 talks about TSR

https://youtu.be/Ez2go78T-8o May 28, 2023 Entire video referring to Plaintiff as to anonymous emails.

https://youtu.be/zAkVdwEZVlg June 13, 2023, Entire whole video speaking about Plaintiffs businesses; and W.D. Wash. case

https://youtu.be/3J0V86yA4Fg June 18, 2023 Enture video attacking Dungeon Hobby and TSR; making false statements saying the TSR trademarks

https://youtu.be/3AkvkuQY4Rw June 26, 2023 Entire video Stiene talking about TSR bankruptcy with speculation, lies and opinion. Statements by Defendant Rachel Stiene

https://youtu.be/rZ7qXbH71W0 June 28, 2023, Defendant appearing on Youtube video of Don Semora; Time: 33:00 to 34:00, Defendant talks about TSR and Dungeon Hobby, and Plaintiff.

https://www.youtube.com/live/s0eOe9KQ_SI?feature=share July 28, 2023 Time 52:00, Stiene talks about TSR

https://youtu.be/15m8gnm2vNA July 31, 2023, Stiene's numerous comments about litigation; Time 5:15 comments regarding the W.D. Wash. case

https://youtu.be/6rU6aza5z5c Aug 4, 2023, Entire video; false statements regarding third parties and Plaintiffs

https://www.youtube.com/live/GaqFvZUNvpc?feature=share Aug 5, 2023, Time 102:20 refers to Mario etc.

https://youtu.be/tsyzRs8_Bx0?si=92c4djS5LwREQSYN Oct 16 2023 Stiene attacking TSR and Dungeon Hobby

https://youtu.be/bZcdP2gI2YM?si=qGGxsSoDg0vxgD_n Nov 13, 2023: Stiene commenting bout W.D. Wash. Case; further damaging comments about TSR and Plaintiff

https://youtu.be/9F_LvtIw8yo?si=5GccdERvsaDRjYlP Jan 16 2024: Stiene falsely accusing Plaintiff of sending emails to individuals

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                           Plaintiff,

             -against-                                 22-cv-10016 (LAK)

DONALD J. TRUMP,

                           Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## VERDICT FORM

### Battery

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

1.     Mr. Trump raped Ms. Carroll?

           YES _____          NO __✓__

           *[If you answered "Yes," skip to Question 4. If you answered "No," continue to Question 2.]*

2.     Mr. Trump sexually abused Ms. Carroll?

           YES __✓__          NO _____

           *[If you answered "Yes," skip to Question 4.  If you answered "No," continue to Question 3.]*

3.     Mr. Trump forcibly touched Ms. Carroll?

           YES _____          NO _____

           *[If you answered "Yes," continue to Question 4.  If you answered "No," skip to Question 6.]*

4.     Ms. Carroll was injured as a result of Mr. Trump's conduct?

           YES __✓__          NO _____

            If "Yes," insert a dollar amount that would fairly and adequately compensate her for that injury or those injuries.

                $ _2,000,000 —_ ( 2 million)

EXHIBIT C

2

If "No," insert $1.

$ _____

*[Continue to Question 5, whether you answered "Yes" or "No."]*

5.  Mr. Trump's conduct was willfully or wantonly negligent, reckless, or done with a conscious disregard of the rights of Ms. Carroll, or was so reckless as to amount to such disregard?

    YES ___✓___          NO _____

    If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

    $ 20,000 — (twenty thousand)

    *[Continue to Question 6, whether you answered "Yes" or "No."]*

**Defamation**

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

6.  Mr. Trump's statement was defamatory?

    YES ___✓___          NO _____

    *[If you answered "Yes," continue to Question 7. If you answered "No," stop here and return your verdict.]*

**Did Ms. Carroll prove, by clear and convincing evidence, that**

7.  Mr. Trump's statement was false?

    YES ___✓___          NO _____

    *[If you answered "Yes," continue to Question 8.  If you answered "No," stop here and return your verdict.]*

8.  Mr. Trump made the statement with actual malice?

    YES ___✓___          NO _____

    *[If you answered "Yes," continue to Question 9.  If you answered "No," stop here and return your verdict.]*

EXHIBIT C

3

**Did Ms. Carroll prove, by a preponderance of the evidence, that**

9.  Ms. Carroll was injured as a result of Mr. Trump's publication of the October 12, 2022 statement?

     YES __✓__          NO _____

     If "Yes," insert a dollar amount for any damages other than the reputation repair program.

     $ _1,000,000. — (1 million)_

     If "Yes," insert a dollar amount for any damages for the reputation repair program only.

     $ _1,700,000. — (1.7 million)_

     If "No," insert $1.

     $ _____

     *[Continue to Question 10, whether you answered "Yes" or "No."]*

10. In making the statement, Mr. Trump acted maliciously, out of hatred, ill will, spite or wanton, reckless, or willful disregard of the rights of another?

     YES __✓__          NO ____

     If "Yes," how much, if any, should Mr. Trump pay to Ms. Carroll in punitive damages?

     $ _280,000. — (two hundred eighty thousand)_

     *[Please write your juror number (not you seat number or name) in the space provided below, fill in the date, and inform the officer that you have reached a verdict.]*

Dated:  ___5/9___ , 2023

EXHIBIT C

4

Juror numbers:

| | |
|---|---|
| 10 | 58 |
| 37 | 77 |
| 39 | 80 |
| 44 | 81 |
| 48 | |

EXHIBIT C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TSR LLC,

                    Plaintiff,                    Case No. C21-1705-SKV

          v.

WIZARDS OF THE COAST LLC,

                    Defendant.                    ORDER RE:  MOTION FOR
                                                  PRELIMINARY INJUNCTION

WIZARDS OF THE COAST LLC,

                    Counterclaim Plaintiff,

          v.

TSR LLC; JUSTIN LANASA; and DUNGEON
HOBBY SHOP MUSEUM LLC,

                    Counterclaim Defendants.

INTRODUCTION

     TSR LLC (TSR) filed this civil lawsuit seeking a declaratory judgment as to Wizards of

the Coast LLC's (Wizards) lack of ownership over certain trademarks and copyrights.  Dkt. 1.

Wizards denies the alleged lack of ownership and filed counterclaims against TSR, Dungeon

Hobby Shop Museum LLC (the Museum), and Justin LaNasa, the organizer of TSR and the

Museum.  Dkt. 11.  Wizards' counterclaims include false designation of origin and

[EXHIBIT D]

cybersquatting in violation of Section 43(a) and (d) of the Lanham Act, 15 U.S.C. § 1125(a) and (d), common law trademark infringement and unfair competition, and violations of North Carolina and Washington State law.

Wizards now moves for a preliminary injunction.  Dkts. 31 & 35-2.  TSR, the Museum, and Mr. LaNasa (collectively "Counterclaim Defendants") oppose the motion.  Dkt. 37.  The Court, having held oral argument and having considered the pending motion, the filings in support and opposition, and the remainder of the record, DENIES the motion for the reasons set forth below.

<u>BACKGROUND</u>

The motion for preliminary injunctive relief concerns the use of "TSR" and "Star Frontiers" word marks ("TSR Mark" and "Star Frontiers Mark" or, collectively, "Marks").  Wizards' association with these trademarks dates back to 1997, when it purchased TSR, Inc., the company that created Dungeons & Dragons (D&D).  Dkt. 1, ¶12.  TSR, Inc. formally assigned all of its U.S. trademark registrations to Wizards on or about May 30, 1997, and the assignment was recorded with the United States Patent and Trademark Office (USPTO) on December 6, 2000.  Dkt. 11 at 9, ¶¶17-18, Ex. A.

Counterclaim Defendants assert their right to the Marks.  They contend Wizards allowed its rights to be cancelled by failing to submit proof of use in interstate commerce to the USPTO, resulting in cancellation of the registration of the TSR Mark on January 4, 2003 and the Star Frontiers Mark on April 17, 2004.  *See* Dkt. 38, ¶¶5-6, Exs. A-B.  TSR applied for and registered various TSR-related marks beginning on August 19, 2020, began using TSR-related marks in commerce in March and April 2021, and continues to use the Marks today.  Dkt. 39, ¶¶6-11.  TSR began to apply for and publicly state an intent to use Star Frontiers-related marks beginning

on October 25, 2020 and, as of August 24, 2022, began offering playing cards bearing the Star Frontiers Mark on the TSR and Museum websites. *Id.*, ¶¶12-14.

Wizards denies the loss of its rights through expiration of the registrations and asserts its common law trademark rights due to its continuous use of the Marks in commerce. Wizards licenses the TSR Mark and related D&D intellectual property to OneBookShelf, Inc., and OneBookShelf, Inc. sells older editions of D&D products bearing the TSR Mark and has sold products bearing the TSR Mark continuously since January 2013. Dkt. 35-1, ¶¶6-7. Wizards also licenses the Star Frontiers Mark to OneBookShelf, which has continuously sold products bearing that mark since November 2017. *Id*., ¶¶6, 8.

Wizards wrote to TSR claiming Wizards' ownership and continued use of the Marks on June 30, 2021. Dkt. 39, ¶15. In subsequent communications, Wizards demanded Counterclaim Defendants cease and desist their use of the Marks and stated it had licensed the Marks to a third party, but did not provide copies of any license agreements. *Id.*, ¶¶16-17. Wizards also filed a petition in the USPTO to cancel a TSR-related registration that had been issued in August 2021. Dkt. 32, ¶4. On December 29, 2021, TSR filed the current lawsuit in order to resolve the parties' dispute over rights to the Marks. Dkt. 1. In February 2022, Wizards filed USPTO applications for TSR-related marks. Dkt. 38, ¶¶9-12, Exs. E-H.

Counterclaim Defendants assert TSR's superior trademark rights given its USPTO filings and subsequent continuous use and/or public statement of intention to use the Marks in commerce. They dispute Wizards' contention of continuous use. They note, for example, the absence of any evidence Wizards exerted efforts to protect its exclusive use of the Marks between the registration cancellations in 2003/2004 and the sale of products by OneBookShelf beginning in 2013/2017. *See, e.g.,* Dkt. 39, ¶¶4-5.

In seeking preliminary injunctive relief, Wizards states that, in the early days of this litigation, it appeared TSR was not publishing game content with the Marks.  Dkt. 32, ¶6.  While the Museum website offered t-shirts, dice, and stickers with the Marks, it did not have any active listings for game products using the Marks.  *Id*.  However, in July 2022, gaming publications began to cover a "'play test'" release or preview copy of a "Star Frontiers New Genesis" (SFNG) game with racist and transphobic content.  *Id.*, ¶¶10-11, Exs. C-D.  On September 7, 2022, Donald Semora, the owner of Wizard Tower Games and an individual who previously worked with TSR, produced in response to a subpoena a copy of a SFNG play test release containing the offensive material.  *Id.*, ¶12, Ex. E (hereinafter "Subpoenaed SFNG").  Based on the negative press and social media reactions to the Subpoenaed SFNG, Wizards' demonstrated commitment to diversity and inclusivity in gaming, *see* Dkt. 35-1, ¶¶11-18, B-E, and the risk that consumers will mistakenly attribute the SFNG game to Wizards, Wizards requested a narrow injunction preventing Counterclaim Defendants' use of the Marks on any iteration of SFNG products.  Dkt. 35-2 at 22-23.

Counterclaim Defendants deny they created, distributed, or authorized distribution of the Subpoenaed SFNG.  They assert that third parties, including Mr. Semora, made unauthorized and offensive alterations to an editable first draft of an SFNG game, Dkt. 39, ¶23, Ex. J, and made those alterations public in the form of the Subpoenaed SFNG.  *See generally* Dkts. 38-40.  As explained by Mr. LaNasa, aside from his co-writer Dave Johnson, the editable draft of the game was distributed only to Mr. Semora, who received a confidential copy protected by a non-disclosure agreement he signed in October 2021 for the purpose of providing editing and related services.  Dkt. 39, ¶¶22, 26.  Mr. Semora thereafter provided Mr. LaNasa with five copies of an edited version of the game, and Mr. LaNasa made five exact photocopies of the edited version.

*Id.*, ¶24,  Ex. K (hereinafter "LaNasa SFNG").  He shared three of the copies with personal friends to receive feedback on the draft.  *Id.*, ¶27.  The personal relationship between Mr. LaNasa and Mr. Semora, and the business relationship between their companies, subsequently fell apart, and they remain embroiled in a dispute over financial and other matters.  *Id.*, ¶37.

Counterclaim Defendants assert that the LaNasa SFNG does not include any racist, transphobic, or other offensive content.  *Id.*, ¶25.  They also oppose the request for preliminary injunctive relief as a general matter, asserting TSR's rights to the Marks and noting they have not sold any SFNG game, that website images reflected only a digital mockup of a future game, and that listings for the game were removed pending resolution of Wizards' motion.  *Id.*, ¶¶48-50, 55.  Counterclaim Defendants went further at oral argument, confirming through counsel that they had no intention of publishing an SFNG game, including any printing, binding, advertising, marketing, and/or selling, until TSR's complaint for a declaratory judgment is decided.  They noted that the LaNasa SFNG version has not yet been beta tested and clarified that the ten copies of that version were distributed only to personal friends, counsel, and parties to this matter.

Wizards, in reply, argues available metadata evidence indicates the Subpoenaed SFNG originated with Counterclaim Defendants.  Dkt. 44, ¶2, Ex. A.  Wizards further argues that, regardless of the version at issue, it has been irreparably harmed by Counterclaim Defendants' activity.  Wizards observes that the Subpoenaed SFNG was distributed publicly only because Counterclaim Defendants were developing SFNG in the first instance, and argues that the LaNasa SFNG also contains offensive content.  At oral argument, Wizards noted Counterclaim Defendants' continued activity in relation to the Marks, including the sale of playing cards which Wizards construed as marketing efforts to promote a potential future release of the SFNG game, as well as ongoing negative attention associated with the SFNG game.

DISCUSSION

A party seeking a preliminary injunction must satisfy one of two tests. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). The first test requires the moving party to show: (1) the likelihood of success on the merits; (2) the likelihood of suffering irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, under the "'sliding scale'" version of this test, a preliminary injunction may be appropriate where there are serious questions going to the merits and the balance of hardships tips sharply in a moving party's favor. *All. for the Wild Rockies*, 865 F.3d at 1217 (citations omitted).[1] This alternative test also requires the moving party to satisfy the irreparable harm and public interest factors. *Id.*

The purpose of a preliminary injunction is to preserve the positions of the parties until a trial on the merits can be held. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). It is "'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoted source omitted; emphasis added by Supreme Court). *See also Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right."). "'In all cases, the burden of persuasion remains with the party seeking preliminary injunctive relief.'" *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1024 (C.D. Cal. 2011) (quoted source omitted).

In this case, Wizards argues it is likely to succeed on the merits of its claim for false

---

[1] "'[S]erious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

[EXHIBIT D]

designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and its claim for common law trademark infringement.  Wizards argues that, given the likelihood of success on the Lanham Act claim, it is entitled to a rebuttable presumption of irreparable harm pursuant to 15 U.S.C. § 1116(a).  Wizards also argues there is a likelihood of irreparable harm even without the presumption and that the balance of equities and public interest favor a grant of injunctive relief.  The Court considers Wizards' arguments and TSR's arguments in opposition below.

A.      Likelihood of Success on the Merits

Wizards argues it is likely to succeed on its Lanham Act clam because it can show Counterclaim Defendants (1) used in commerce (2) a word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of the defendant's or another's goods or services.  *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007) (citing 15 U.S.C. § 1125(a)).  Wizards argues its common law trademark infringement claim provides a second, independent basis for preliminary injunctive relief because it can show both its protectible interest in the Marks and the likelihood of consumer confusion.  *See* RCW 19.77.900; *Bio Mgmt. Nw. Inc. v. Washington Bio Servs.*, No. C20-0670-MJP, 2021 WL 4319448, at *2 (W.D. Wash. Sept. 23, 2021).  Counterclaim Defendants dispute Wizards' ownership of the Marks and its showing as to both use in commerce and the likelihood of confusion.  The Court, as discussed below, concludes that, in light of disputed facts, Wizards fails to make a sufficient showing with respect to the merits.

1.      Ownership of Marks:

The Lanham Act "prohibits false representations about the origin of source or manufacture of goods through the use of another's trade name or trademark, either registered or

unregistered." *SMC Promotions, Inc. v. SMC Promotions*, 355 F. Supp. 2d 1127, 1133 (C.D. Cal. 2005).  With unregistered trademarks, a false designation of origin claim is recognized as the equivalent of a claim for trademark infringement.  *Id*.  Accordingly, for both the false designation of origin claim and the common law trademark infringement claim, Wizards must show it has a protectible ownership interest in a mark and that there is a likelihood of consumer confusion.  *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202-03, 1221 (9th Cir. 2012); *Bio Mgmt. Nw. Inc.*, 2021 WL 4319448, at *2 (citations omitted).  *See also Bungie, Inc. v. Aimjunkies.com*, No. C21-0811-TSZ, 2022 WL 1239906, at *3 (W.D. Wash. Apr. 27, 2022) (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985)).

Registration provides prima facie evidence of a valid, protectible interest in a trademark. *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007) (citing *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999))*.*  Without registration, a party must establish its common law right to exclusive use of a trademark.  *Id*.  In this case, Wizards concedes it has not maintained registration of the Marks and asserts its ownership through its common law trademark rights.

"To establish a protectible ownership interest in a common law trademark, the owner must 'establish not only that he or she used the mark before the mark was registered, but also that such use has continued to the present.'"  *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 599 (9th Cir. 2014) (quoting *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005)).  "Continuous usage requires sufficiently public usage as 'to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'"  *Id*. (quoting *Brookfield Commc'ns, Inc.*, 174 F.3d at 1052).

[EXHIBIT D]

Wizards asserts that, while TSR began applying to register the Marks in 2020 and first used the Marks in 2021, Wizards' predecessor in interest (TSR, Inc.) began using the Marks in the 1980s, and Wizards, through its license to OneBookShelf, has continuously used the TSR Mark since at least as early as January 2013 and the Star Frontiers Mark since at least as early as November 2017. *See* Dkt. 1, ¶¶21-24; Dkt. 32, ¶3, Ex. A; Dkt. 35-1, ¶¶3, 7-8. Wizards argues its licensing of the Marks and licensee's promotion and sales show the continuous use necessary to maintain a common law trademark. *See Experience Hendrix, L.L.C. v. Pitsicalis*, No. C17-1927, 2020 WL 3564485, at *3 (S.D.N.Y. July 1, 2020) (finding valid, protectible mark where plaintiffs and their licensees made "continuous and substantial use" of marks), *report and recommendation adopted sub nom. Experience Hendrix, LLC v. Hendrix*, 2020 WL 4261818 (S.D.N.Y. July 24, 2020). It argues this use predates and thus precludes TSR's claims to the Marks.

Counterclaim Defendants dispute Wizards' alleged ownership interest. They point, for example, to the absence of evidence showing Wizards' continuous use of the Marks since its 1997 acquisition of TSR, Inc. or showing Wizards' protection of its exclusive use of the Marks as would be required to maintain ownership. Dkt. 39,¶¶ 4-5 (Mr. LaNasa states: "For example, Jayson Elliot, Ernie Gygax, and Luke Gygax used the TSR Mark . . . between 2011 and 2019 without any assertion of superior rights by [Wizards] that I am aware of.")[2]

In order to show a likelihood of success on the merits under either the Lanham Act or common law, Wizards must show it has a protectible ownership interest in the Marks. In

---

[2] Counterclaim Defendants also note Wizards' failure to provide the licensing agreement with its motion. However, Wizards provides a declaration attesting to the licensing of the Marks and to the sale of thousands of products bearing the TSR and Star Frontiers Marks for, respectively, nine and five years. Dkt. 35-1, ¶¶6-8. Wizards also notes that it produced the licensing agreement to Counterclaim Defendants in discovery and that it would supplement the record upon request. Dkt. 43 at 10 & n.2.

asserting ownership, Wizards maintains it need not offer more than the beginning date and subsequent use of the Marks by its licensee.  In so doing, Wizards did not respond to Counterclaim Defendants' assertions as to the lengthy gap in time between Wizards' acquisition and later licensing of the Marks and its failure to preserve its exclusive use of the Marks.  At oral argument, Counterclaim Defendants argued these and other issues remain in dispute and preclude a finding in Wizards' favor on the question of trademark ownership.

"[I]n deciding a motion for a preliminary injunction, the district court 'is not bound to decide doubtful and difficult questions of law or disputed questions of fact.'"  *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (citing *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964)).  The question of ownership is the issue that prompted TSR to file its lawsuit and that issue remains at the center of the dispute between the parties.  Wizards may well, in future, establish its ownership interest in the Marks through earlier and continuous use.  However, there are too many unresolved issues and factual disputes for the Court to find that Wizards has demonstrated a likelihood of success at this stage.  *See Marina Vape, LLC v. Nashick*, No. C16-1028, 2016 WL 9086939, at *11 (C.D. Cal. May 6, 2016) (finding significant issues as to whether it was appropriate to determine a likelihood of prevailing on the merits where "competing evidence presented by the parties reflects their fundamental disagreement on the facts that underlie their respective claims" as to ownership of a trademark); *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, No. C14-4050, 2014 WL 6788310, at *8 (N.D. Cal. Dec. 2, 2014) (finding that, while plaintiff may ultimately be able to demonstrate ownership of a trademark, there were "too many unresolved issues and factual disputes" for the Court to find a demonstration of a likelihood of success).  *See generally SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075, 1092 (C.D. Cal. 2001)

("Adobe does not demonstrate a likelihood of success on the merits of this claim because questions of fact predominate as to the central issue.")

2.    Use in Commerce and Likelihood of Confusion:

Wizards must also show use in commerce and a likelihood of confusion.  However, the Court is not inclined to enter into a detailed analysis of the arguments addressing the remaining elements of the claims given the outstanding factual dispute and other issues discussed below. The Court therefore declines to assess a likelihood of success on the merits in relation to either use in commerce or a likelihood of consumer confusion.

3.    Serious Questions on the Merits:

The Court likewise declines to determine whether there are serious questions going to the merits and allowing for a grant of preliminary injunctive relief under the sliding scale test. Instead, and as discussed below, the Court finds that relief is not warranted because the Court finds there is not a likelihood of irreparable harm in the absence of a preliminary injunction.

B.    Likelihood of Suffering Irreparable Harm

Because the Court does not find a likelihood of success on the merits for the false designation claim, Wizards is not entitled to a rebuttable presumption of irreparable harm under 15 U.S.C. § 1116(a).  The Court further finds, for the reasons discussed below, that the likelihood of irreparable harm has not been established.

In its motion, Wizards proffered as evidence of irreparable harm the fact that both Wizards and its licensee invest heavily in marketing and promoting role playing game (RPG) products, including Star Frontiers.  Dkt. 35-1, ¶9 (also pointing to a new acquisition of its parent company that will expand its RPG offerings and enable online play).  The motion otherwise focuses almost exclusively on the Subpoenaed SFNG.  Wizards asserts that, from the December

[EXHIBIT D]

29, 2021 filing of this case until the end of July 2022, it believed TSR was not actually selling or distributing any games bearing the Marks. *Id.*, ¶10. Wizards further asserts that the racist, transphobic, and other offensive content in the Subpoenaed SFNG directly conflicts with Wizards' commitment to diversity and inclusivity in the gaming community, as demonstrated by its public posts and statements on these issues, associated changes made to its games and advertising content, and public recognition of these efforts. *Id.*, ¶¶11-15, Exs. B-D. Wizards argues that mistaken attribution of the SFNG game to Wizards will sully its reputation and harm its efforts to promote inclusivity in gaming, *id.*, ¶19, and that the damage to its goodwill and loss of control over its reputation constitute irreparable harm.

Counterclaim Defendants observe that Wizards bases its concerns regarding reputation and goodwill on the Subpoenaed SFNG, a document Counterclaim Defendants did not create or distribute, and that they wholly disavow. They argue that, if Wizards is entitled to protection in relation to the Subpoenaed SFNG, it must seek an injunction against the individual(s) who wrote and released that document to the public.

Wizards, in its reply, argues that metadata associated with the Subpoenaed SFNG can be interpreted to infer Counterclaim Defendants' involvement or at least undermine their declaration testimony. Dkt. 43 at 11-12 (citing Dkt. 44, ¶¶2-4, Exs. A-C; Dkt. 39, ¶¶23, 41; and Dkt. 40, ¶6). Wizards also argues that, whether or not Counterclaim Defendants were involved with the Subpoenaed SFNG, their activities resulted in the dissemination and infringement of Wizards' Marks and therefore caused the harm alleged. Wizards additionally argues it would be harmed by offensive elements of the LaNasa SFNG. *See* Dkt. 43 at 14.

A party seeking preliminary injunctive relief must allege more than a mere possibility of harm; they must "demonstrate that irreparable injury is *likely* in the absence of an injunction."

*Winter*, 555 U.S. at 22.  Economic injury alone does not support a finding of irreparable harm because such injury can be remedied by a damage award.  *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citation omitted).  However, "intangible injuries," including damage to goodwill and reputation, can constitute irreparable harm.  *Id.*  Specifically, under Ninth Circuit law, "'[e]vidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm,' so long as there is concrete evidence in the record of those things."  *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) (quoted source omitted).  For example, in *adidas Am., Inc.*, 890 F.3d at 756-57, the Ninth Circuit upheld a finding of irreparable harm where "extensive and targeted advertising and unsolicited media," along with tight control of supply, demonstrated adidas "built a specific reputation" around a product with intangible benefits, and customer survey results showing consumer confusion demonstrated those intangible benefits would be harmed without injunctive relief "because consumers will be confused about the source of the shoes." *Id.* (quoted source omitted).  *See also 2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017) (finding evidence that use of trademarks to release an unapproved line of products after termination of an agreement was enough to show a trademark owner "likely will lose some measure of control over their business reputation in the absence of injunctive relief."); *Amazon.com Inc. v. Robojap Techs. LLC*, No. C20-0694-MJP, 2021 WL 5232130, at *4 (W.D. Wash. Nov. 10, 2021) (finding misuse of trademarks harmed Amazon's "goodwill by misleading consumers into believing that Amazon's trademarks were associated with a fraudulent and deceptive tech support scheme.")

    In this case, the primary basis for Wizards' request for preliminary injunctive relief – the Subpoenaed SFNG – is subject to a dispute of fact.  While it is understandable why the content

of the document prompted Wizards to seek a preliminary injunction, the evidence before the

Court does not allow for a determination of the individual(s) responsible for creating and

disseminating the Subpoenaed SFNG.[3]  What *is* clear is that Counterclaim Defendants have

disavowed the Subpoenaed SFNG, rendering an injunction directed at Counterclaim Defendants

futile.[4]

Similarly, the Court does not find irreparable harm established in relation to the LaNasa

SFNG.  There is no evidence this version of an SFNG game has been made available publicly or

posed harm to Wizards' reputation and goodwill.  Indeed, the only evidence before the Court is

to the contrary.  *See* Dkt. 39, ¶¶ 24-28, 35, 42-45, 48-50 (attesting that the SFNG game does not

yet exist in book form and has never been sold or made available to the public, and describing

the existence of ten total copies of the LaNasa SFNG, three of which were provided to Mr.

LaNasa's personal friends to receive feedback on the draft); *accord* Dkt. 40, ¶¶9-10, 13, and the

arguments of counsel at oral argument (explaining that the LaNasa SFNG has not yet been beta

tested and that the ten copies of the final draft were distributed only to personal friends, counsel,

and parties to this matter).

Finally, there is now an additional and compelling reason to conclude that preliminary

injunctive relief is not warranted.  At oral argument, counsel for Counterclaim Defendants

---

[3] Nor is the Court bound to resolve the factual dispute at this juncture.  *Int'l Molders' & Allied Workers' Loc. Union No. 164,* 799 F.2d at 551.  *See also SQP, Inc. v. Sirrom Sales, Inc.*, 130 F. Supp. 2d 364, 368 (N.D.N.Y. 2001) ("A disputed question of fact such as this need not be resolved on an application for a preliminary injunction. Rather, determination of disputed facts should be made at trial.") (internal citations omitted).

[4] Because a moving party must show it is likely to suffer irreparable harm in the absence of a preliminary injunction, *Winter*, 555 U.S. at 22, the relief sought must necessarily serve to remedy the harm alleged.  *See, e.g.*, *Montana Env't Info. Ctr. v. Bernhardt*, No. C19-0130, 2021 WL 243140, at *4 (D. Mont. Jan. 25, 2021) (finding that, because a preliminary injunction would not prevent the injuries alleged, Plaintiffs had not satisfied their burden to clearly demonstrate the likelihood of irreparable harm in the absence of a preliminary injunction with regard to those injuries).

[EXHIBIT D]

assured the Court they had no intention of publishing an SFNG game until TSR's complaint for a declaratory judgment is decided.  It is, under these circumstances, unlikely Wizards will suffer irreparable harm from Counterclaim Defendants' activities in relation to SFNG products pending the outcome of these proceedings.

Nor is the Court persuaded by Wizards' remaining arguments.  As an initial matter, to the extent Wizards asserts a likelihood of irreparable harm flowing from any and all activities relating to the Marks, this contention is not supported.  That is, Wizards does not identify concrete evidence of a loss of control over its business reputation and damage to its goodwill separate and apart from the Subpoenaed SFNG and LaNasa SFNG games, which Counterclaim Defendants have either disavowed or committed to refrain from publishing.  In fact, it is apparent Wizards did not see a need for a preliminary injunction until Mr. Semora produced the Subpoenaed SFNG.  *See* Dkt. 35-2 at 9-10 (describing the "early days of this litigation", prior to the filing of the motion for a preliminary injunction, as including the "out of stock" website listing for a SFNG game) and 22-23 (stating Counterclaim Defendants' "general infringement can be remedied through future injunctive relief and monetary damages which Wizards will prove at trial" and that Wizards sought only a narrow injunction on use of the Marks on any iteration of SFNG products).  At oral argument, Wizards expressed concern regarding the SFNG playing cards that are available on Counterclaim Defendants' website, arguing that the cards reflected Counterclaim Defendants' efforts to market a future game release.  But the existence of the cards themselves does not rise to the level of irreparable harm required to warrant a preliminary injunction.  It is the harmful *content* of the Subpoenaed and LaNasa SFNG games that Wizards identifies as giving rise to reputational harm, not the fact of the use of the Marks.

In sum, because Counterclaim Defendants disavowed the Subpoenaed SFNG and have committed not to publish the LaNasa SFNG during the pendency of this litigation, Wizards does not demonstrate the likelihood of irreparable harm in the absence of a preliminary injunction. The Court therefore need not and does not address whether the balance of equities and public interest favor a preliminary injunction.  *See Ctr. for Food Safety*, 636 F.3d at 1174 (where a moving party does not show it is "'likely to suffer irreparable harm in the absence of preliminary relief,'" the court "need not address the . . . remaining elements of the preliminary injunction standard.") (quoting *Winter*, 555 U.S. at 20).

<u>CONCLUSION</u>

For the reasons set forth above, the Motion for a Preliminary Injunction, Dkts. 31 & 35-2, is DENIED.  The Clerk is directed to send a copy of this Order to the parties.

Dated this 14th day of December, 2022.


S. KATE VAUGHAN
United States Magistrate Judge

[EXHIBIT D]